(Slip Opinion) OCTOBER TERM, 2023 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HARRINGTON, UNITED STATES TRUSTEE, REGION 2 *v.* PURDUE PHARMA L. P. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 23–124. Argued December 4, 2023—Decided June 27, 2024

Between 1999 and 2019, approximately 247,000 people in the United States died from prescription-opioid overdoses. Respondent Purdue Pharma sits at the center of that crisis. Owned and controlled by the Sackler family, Purdue began marketing OxyContin, an opioid prescription pain reliever, in the mid-1990s. After Purdue earned billions of dollars in sales on the drug, in 2007 one of its affiliates pleaded guilty to a federal felony for misbranding OxyContin as a less-addictive, less-abusable alternative to other pain medications. Thousands of lawsuits followed. Fearful that the litigation would eventually impact them directly, the Sacklers initiated a "milking program," withdrawing from Purdue approximately $11 billion—roughly 75% of the firm's total assets—over the next decade.

Those withdrawals left Purdue in a significantly weakened financial state. And in 2019, Purdue filed for Chapter 11 bankruptcy. During that process, the Sacklers proposed to return approximately $4.3 billion to Purdue's bankruptcy estate. In exchange, the Sacklers sought a judicial order releasing the family from all opioid-related claims and enjoining victims from bringing such claims against them in the future. The bankruptcy court approved Purdue's proposed reorganization plan, including its provisions concerning the Sackler discharge. But the district court vacated that decision, holding that nothing in the law authorizes bankruptcy courts to extinguish claims against third parties like the Sacklers, without the claimants' consent. A divided panel of the Second Circuit reversed the district court and revived the bankruptcy court's order approving a modified reorganization plan.

*Held*: The bankruptcy code does not authorize a release and injunction

that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants. Pp. 7–19.

(a) When a debtor files for bankruptcy, it "creates an estate" that includes virtually all the debtor's assets. 11 U. S. C. §541(a). Under Chapter 11, the debtor must develop a reorganization plan governing the distribution of the estate's assets and present it to the bankruptcy court for approval. §§1121, 1123, 1129, 1141. A bankruptcy court's order confirming a reorganization plan "discharges the debtor" of certain pre-petition debts. §1141(d)(1)(A). In this case, the Sacklers have not filed for bankruptcy or placed all their assets on the table for distribution to creditors, yet they seek what essentially amounts to a discharge. No provision of the code authorizes that kind of relief. Pp. 7–17.

(1) Section 1123(b) addresses the kinds of provisions that may be included in a Chapter 11 plan. That section contains five specific paragraphs, followed by a catchall provision. The first five paragraphs all concern the debtor's rights and responsibilities, as well as its relationship with its creditors. The catchall provides that a plan "may" also "include any other appropriate provision not inconsistent with the applicable provisions of this title." All agree that the first five paragraphs do not authorize the Sackler discharge. But, according to the plan proponents and the Second Circuit, paragraph (6) broadly permits any term not expressly forbidden by the code so long as a judge deems it "appropriate." Because provisions like the Sackler discharge are not expressly prohibited, they reason, paragraph (6) necessarily permits them. That is not correct. When faced with a catchall phrase like paragraph (6), courts do not necessarily afford it the broadest possible construction it can bear. *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 512. Instead, we generally appreciate that the catchall must be interpreted in light of its surrounding context and read to "embrace only objects similar in nature" to the specific examples preceding it. *Ibid.* Here, each of the preceding paragraphs concerns the rights and responsibilities of the debtor; and they authorize a bankruptcy court to adjust claims without consent only to the extent such claims concern the debtor. While paragraph (6) doubtlessly confers additional authorities on a bankruptcy court, it cannot be read under the canon of *ejusdem generis* to endow a bankruptcy court with the "radically different" power to discharge the debts of a nondebtor without the consent of affected claimants. *Epic Systems Corp.*, 584 U. S., at 513. And while the dissent reaches a contrary conclusion, it does so only by elevating its view of the bankruptcy code's purported purpose over the text's clear focus on the debtor. Pp. 7–13.

(2) The code's statutory scheme further forecloses the Sackler discharge. The code generally reserves discharge for a debtor who places substantially all of their assets on the table. §1141(d)(1)(A); see also §541(a). And, ordinarily, it does not include claims based on "fraud" or those alleging "willful and malicious injury." §§523(a)(2), (4), (6). The Sackler discharge defies these limitations. The Sacklers have not filed for bankruptcy, nor have they placed virtually all their assets on the table for distribution to creditors. Yet, they seek an order discharging a broad sweep of present and future claims against them, including ones for fraud and willful injury. In all of these ways, the Sacklers seek to pay less than the code ordinarily requires and receive more than it normally permits. Contrary to the dissent's suggestion, plan proponents cannot evade these limitations simply by rebranding their discharge a "release." Pp. 13–16.

(3) History offers a final strike against the plan proponents' construction of §1123(b)(6). Pre-code practice, we have said, may sometimes inform the meaning of the code's more "ambiguous" provisions. *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 649. And every bankruptcy law cited by the parties and their *amici*— from 1800 until the enactment of the present bankruptcy code in 1978—generally reserved the benefits of discharge to the debtor who offered a "fair and full surrender of [its] property." *Sturges* v. *Crowninshield*, 4 Wheat. 122, 176. Had Congress meant to reshape traditional practice so profoundly in the present bankruptcy code, extending to courts the capacious new power the plan proponents claim, one might have expected it to say so expressly "somewhere in the [c]ode itself." *Dewsnup* v. *Timm*, 502 U. S. 410, 420. Pp. 16–17.

(b) In the end, the plan proponents default to policy. The Sacklers, they say, will not return any funds to Purdue's estate unless the bankruptcy court grants them the sweeping nonconsensual release and injunction they seek. Without the Sackler discharge, they predict, victims will be left without any means of recovery. But the U. S. Trustee disagrees. As he tells it, the potentially massive liability the Sacklers face may induce them to negotiate for *consensual* releases on terms more favorable to all the claimants. In addition, the Trustee warns, a ruling for the Sacklers would provide a roadmap for tortfeasors to misuse the bankruptcy system in future cases. While both sides may have their points, this Court is the wrong audience for such policy disputes. Our only proper task is to interpret and apply the law; and nothing in present law authorizes the Sackler discharge. Pp. 17–19.

(c) Today's decision is a narrow one. Nothing in the opinion should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan. Nor does the Court express a view on what qualifies as a consensual release or

Syllabus

pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.  Additionally, because this case involves only a stayed reorganization plan, the Court does not address whether its reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated.  Confining ourselves to the question presented, the Court holds only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.  Because the Second Circuit held otherwise, its judgment is reversed and the case is remanded for further proceedings consistent with this opinion.  P. 19.

69 F. 4th 45, reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which THOMAS, ALITO, BARRETT, and JACKSON, JJ., joined.  KAVANAUGH, J., filed a dissenting opinion, in which ROBERTS, C. J., and SOTOMAYOR and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–124
_____

## WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, REGION 2, PETITIONER *v.* PURDUE PHARMA L. P., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 27, 2024]

JUSTICE GORSUCH delivered the opinion of the Court.

The bankruptcy code contains hundreds of interlocking rules about "'the relations between'" a "'debtor and [its] creditors.'" *Wright* v. *Union Central Life Ins. Co.*, 304 U. S. 502, 513–514 (1938). But beneath that complexity lies a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors. The debtor in this case, Purdue Pharma L. P., filed for bankruptcy after facing a wave of litigation for its role in the opioid epidemic. Purdue's long-time owners, members of the Sackler family, confronted a growing number of suits too. But instead of declaring bankruptcy, they chose a different path. From the court overseeing Purdue's bankruptcy, they sought and won an order extinguishing vast numbers of existing and potential claims against them. They obtained all this without securing the consent of those affected or placing anything approaching their total assets on the table for their creditors. The question we face is whether the bankruptcy code authorizes a court to issue an order like that.

# I

## A

The opioid epidemic represents "one of the largest public health crises in this nation's history." *In re Purdue Pharma L. P.*, 69 F. 4th 45, 56 (CA2 2023). Between 1999 and 2019, approximately 247,000 people in the United States died from prescription-opioid overdoses. *In re Purdue Pharma L. P.*, 635 B. R. 26, 44 (SDNY 2021). The U. S. Department of Health and Human Services estimates that the opioid epidemic has cost the country between $53 and $72 billion annually. *Ibid.*

Purdue sits at the center of these events. In the mid-1990s, it began marketing OxyContin, an opioid prescription pain reliever. 69 F. 4th, at 56. Because of the addictive quality of opioids, doctors had traditionally reserved their use for cancer patients and those "with chronic diseases." 635 B. R., at 42. But OxyContin, Purdue claimed, had a novel "time-release" formula that greatly diminished the threat of addiction. *Ibid.* On that basis, Purdue marketed OxyContin for use in "'a much broader range'" of applications, including as a "'first-line therapy for the treatment of arthritis.'" *Ibid.*

Purdue was a "'family company,'" owned and controlled by the Sacklers. *Id.*, at 40. Members of the Sackler family served as president and chief executive officer; they dominated the board of directors; and they "were heavily involved" in the firm's marketing strategies. 69 F. 4th, at 86 (Wesley, J., concurring in judgment). They "pushed sales targets," too, and "accompanied sales representatives on 'ride along' visits to health care providers" in an effort to maximize OxyContin sales. 635 B. R., at 50.

Quickly, OxyContin became "'the most prescribed brand-name narcotic medication'" in the United States. *Id.*, at 43. Between 1996 and 2019, "Purdue generated approximately $34 billion in revenue . . . , most of which came from Oxy-Contin sales." *Id.*, at 39. The company's success propelled

the Sacklers onto lists "of the top twenty wealthiest families in America," with an estimated net worth of $14 billion. *Id.*, at 40.

Eventually, however, the firm came under scrutiny. In 2007, a Purdue affiliate pleaded guilty to a federal felony for misbranding OxyContin as "'less addictive'" and "'less subject to abuse . . . than other pain medications.'" *Id.*, at 48. Thousands of civil lawsuits followed as individuals, families, and governments within and outside the United States sought damages from Purdue and the Sacklers for injuries allegedly caused by their deceptive marketing practices. 69 F. 4th, at 60.

Appreciating this litigation "would eventually impact them directly," *id.*, at 59, the Sacklers began what one family member described as a "'milking' program," 635 B. R., at 57. In the years before the 2007 plea agreement, Purdue's distributions to the Sacklers represented less than 15% of its annual revenue. *Ibid.* After the plea agreement, the Sacklers began taking as much as 70% of the company's revenue each year. *Ibid.* Between 2008 and 2016, the family's distributions totaled approximately $11 billion, draining Purdue's total assets by 75% and leaving it in "a significantly weakened financial" state. 69 F. 4th, at 59. The Sacklers diverted much of that money to overseas trusts and family-owned companies. 635 B. R., at 71.

B

In 2019, Purdue filed for Chapter 11 bankruptcy. Members of the Sackler family saw in that development an opportunity "to get [their own] goals accomplished." *In re Purdue Pharma L. P.*, No. 19–23649 (Bkrtcy. Ct. SDNY, Aug. 18, 2021), ECF Doc. 3599, p. 35 (testimony of David Sackler). They proposed to return to Purdue's bankruptcy estate $4.325 billion of the $11 billion they had withdrawn from the company in recent years. 69 F. 4th, at 61. But they offered to do so only through payments spread out over a

decade. *Id.*, at 60. And, in return, they sought the estate's agreement on, and a judicial order addressing, two matters. First, the Sacklers wanted to extinguish any claims the estate might have against family members, including for fraudulently transferring funds from Purdue in the years preceding its bankruptcy. *In re Purdue Pharma L. P.*, 633 B. R. 53, 83–84 (Bkrtcy. Ct. SDNY 2021). Second, the Sacklers wanted to end the growing number of lawsuits against them brought by opioid victims (the Sackler discharge). *Ibid.*

The Sackler discharge they proposed comprised a release and an injunction. The release sought to void not just current opioid-related claims against the family, but future ones as well. It sought to ban not just claims by creditors participating in the bankruptcy proceeding, but claims by anyone who might otherwise sue Purdue. It sought to extinguish not only claims for negligence, but also claims for fraud and willful misconduct. 1 App. 193. And it proposed to end all these lawsuits without the consent of the opioid victims who brought them. To enforce this release, the Sacklers sought an injunction "forever stay[ing], restrain[ing,] and enjoin[ing]" claims against them. *Id.*, at 279. That injunction would not just prevent suits against the company's officers and directors but would run in favor of hundreds, if not thousands, of Sackler family members and entities under their control. *Id.*, at 117–190.

Purdue agreed to these terms and included them in the reorganization plan it presented to the bankruptcy court for approval. In that plan, Purdue further proposed to reorganize as a "public benefit" company dedicated primarily to opioid education and abatement efforts. 633 B. R., at 74. As for individual victims harmed by the company's products, Purdue offered, with help from the Sacklers' anticipated contribution, to provide payments from a base amount of $3,500 up to a ceiling of $48,000 (for the most dire cases, and all before deductions for attorney's fees and

other expenses). See 1 App. 557–559, 573–585; 6 App. in No. 22–110 etc. (CA2), p. 1697. For those receiving more than the base amount, payments would come in installments spread over as many as 10 years. 7 *id.*, at 1805, 1812.

Creditors were polled on the proposed plan. Though most who returned ballots supported it, fewer than 20% of eligible creditors participated. 21 *id.*, at 6253, 6258. Thousands of opioid victims voted against the plan too, and many pleaded with the bankruptcy court not to wipe out their claims against the Sacklers without their consent. 635 B. R., at 35. "Our system of justice," they wrote, "demands that the allegations against the Sackler family be fully and fairly litigated in a public and open trial, that they be judged by an impartial jury, and that they be held accountable to those they have harmed." *In re Purdue Pharma L. P.*, No. 7:21–cv–07532 (SDNY, Oct. 25, 2021), ECF Doc. 94, p. 21 (internal quotation marks omitted). The U. S. Trustee, charged with promoting the integrity of the bankruptcy system for all stakeholders, joined in these objections. So did eight States, the District of Columbia, the city of Seattle, and various Canadian municipalities and Tribes, each of which sought to pursue its own claims against the Sacklers. 635 B. R., at 35.

C

The bankruptcy court rejected the objectors' arguments and entered an order confirming the plan, including its provisions related to the Sackler discharge. 633 B. R., at 95–115. Soon, however, the district court vacated that decision. Nothing in the law, that court held, authorized the bankruptcy court to extinguish claims against the Sacklers without the consent of the opioid victims who brought them. 635 B. R., at 115.

After that setback, plan proponents, including Purdue, members of the Sackler family, and various creditors, ap-

pealed to the Second Circuit. While their appeal was pending, they also floated a new proposal. Now, they said, the Sacklers were willing to contribute an additional $1.175 to $1.675 billion to Purdue's estate if the eight objecting States and the District of Columbia would withdraw their objections to the firm's reorganization plan. 69 F. 4th, at 67. The Sacklers' proposed contribution still fell well short of the $11 billion they received from the company between 2008 and 2016. Nor did it begin to reflect the earnings the Sacklers have enjoyed from that sum over time. And the proposed contribution would still come in installments spread over many years. But the new proposal was enough to persuade the States and the District of Columbia to drop their objections to the plan, even as a number of individual victims, the Canadian creditors, and the U. S. Trustee persisted in theirs.

Ultimately, a divided panel of the Second Circuit reversed the district court and revived the bankruptcy court's order approving the estate's (now-modified) reorganization plan. Writing separately, Judge Wesley acknowledged that a bankruptcy court enjoys broad authority to modify debtor-creditor relations. But, he argued, nothing in the bankruptcy code grants a bankruptcy court the "extraordinary" power to release and enjoin claims against a third party without the consent of the affected claimants. *Id.*, at 89 (opinion concurring in judgment). The majority's contrary view, he added, "pin[ned the Second] Circuit firmly on one side of a weighty issue that, for too long, has split the courts of appeals." *Id.*, at 90.

After the Second Circuit ruled, the U. S. Trustee filed an application with this Court to stay its decision. We granted the application and, treating it as a petition for a writ of certiorari, agreed to take this case to resolve the circuit split Judge Wesley highlighted. 600 U. S. ___ (2023).[1]

--------

[1] For examples of decisions on both sides of the split, compare *In re*

## II

The plan proponents and U. S. Trustee agree on certain foundational points. When a debtor files for bankruptcy, it "creates an estate" that includes virtually all the debtor's assets. 11 U. S. C. §541(a). Under Chapter 11, the debtor can work with its creditors to develop a reorganization plan governing the distribution of the estate's assets; it must then present that plan to the bankruptcy court and win its approval. §§1121, 1123, 1129, 1141. Once the bankruptcy court issues an order confirming the plan, that document binds the debtor and its creditors going forward—even those who did not assent to the plan. §1141(a).

Most relevant here, a bankruptcy court's order confirming a plan "discharges the debtor from any debt that arose before the date of such confirmation," except as provided in the plan, the confirmation order, or the code. §1141(d)(1)(A). That discharge not only releases or "void[s] any past or future judgments on the" discharged debt; it also "operat[es] as an injunction . . . prohibit[ing] creditors from attempting to collect or to recover the debt." *Tennessee Student Assistance Corporation* v. *Hood*, 541 U. S. 440, 447 (2004) (citing §§524(a)(1), (2)). Generally, however, a discharge operates only for the benefit of the debtor against its creditors and "does not affect the liability of any other entity." §524(e).

The Sacklers have not filed for bankruptcy and have not placed virtually all their assets on the table for distribution to creditors, yet they seek what essentially amounts to a

_____

*Pacific Lumber Co.*, 584 F. 3d 229 (CA5 2009); *In re Lowenschuss*, 67 F. 3d 1394 (CA9 1995); *In re Western Real Estate Fund, Inc.*, 922 F. 2d 592 (CA10 1990), with *In re Millennium Lab Holdings II, LLC*, 945 F. 3d 126 (CA3 2019); *In re Seaside Engineering & Surveying, Inc.*, 780 F. 3d 1070 (CA11 2015); *In re Airadigm Communications, Inc.*, 519 F. 3d 640 (CA7 2008); *In re Dow Corning Corp.*, 280 F. 3d 648 (CA6 2002); *In re A. H. Robins Co.*, 880 F. 2d 694 (CA4 1989).

discharge.  They hope to win a judicial order releasing pend-
ing claims against them brought by opioid victims.  They
seek an injunction "permanently and forever" foreclosing
similar suits in the future.  1 App. 279.  And they seek all
this without the consent of those affected.  The question we
face thus boils down to whether a court in bankruptcy may
effectively extend to *nondebtors* the benefits of a Chapter
11 discharge usually reserved for *debtors*.

### A

For an answer, we turn to §1123.  It addresses the "[c]on-
tents"—or terms—of the bankruptcy reorganization plan a
debtor presents and a court approves in Chapter 11 pro-
ceedings.  Some plan terms are mandatory, §1123(a); others
are optional, §1123(b).  No one suggests that anything like
the Sackler discharge *must* be included in a debtor's reor-
ganization plan.  Instead, plan proponents contend, it is a
provision a debtor *may* include and a court *may* approve in
a reorganization plan.

Section 1123(b) governs that question.  It directs that a
plan "may":

> "(1) impair or leave unimpaired any class of claims,
> secured or unsecured, or of interests;
>
> "(2) . . . provide for the assumption, rejection, or as-
> signment of any executory contract or unexpired lease
> of the debtor not previously rejected under [§365];
>
> "(3) provide for—
>
> "(A) the settlement or adjustment of any claim or in-
> terest belonging to the debtor or to the estate; or
>
> "(B) the retention and enforcement by the debtor, by
> the trustee, or by a representative of the estate ap-
> pointed for such purpose, of any such claim or interest;
>
> "(4) provide for the sale of all or substantially all of
> the property of the estate, and the distribution of the
> proceeds of such sale among holders of claims or inter-
> ests;

"(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

"(6) include any other appropriate provision not inconsistent with the applicable provisions of this title."

We can easily rule out the first five of these paragraphs as potential sources of legal authority for the Sackler discharge. They permit a plan to address claims and property belonging to a debtor or its estate. §§1123(b)(2), (3), (4). They permit a plan to modify the rights of creditors who hold claims against the debtor or its estate. §§1123(b)(1), (5). But nothing in those paragraphs authorizes a plan to extinguish claims against third parties, like the Sacklers, without the consent of the affected claimants, like the opioid victims. If authority for the Sackler discharge can be found anywhere, it must be found in paragraph (6). That is the paragraph on which the Second Circuit primarily rested its decision below, and it is the one on which plan proponents pin their case here.[2]

As the plan proponents see it, paragraph (6) allows a

––––––––––

[2] The Sacklers suggest that, if 11 U. S. C. §1123(b) does not permit a bankruptcy court to release and enjoin claims against a nondebtor without the affected claimants' consent, §105(a) does. See Brief for Mortimer-Side Initial Covered Respondents 19 (Brief for Sackler Family). That provision allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the bankruptcy code. §105(a). As the Second Circuit recognized, however, "§105(a) alone cannot justify" the imposition of nonconsensual third-party releases because it serves only to "'carry out'" authorities expressly conferred elsewhere in the code. 69 F. 4th 45, 73 (2023) (quoting §105(a)); see also 2 R. Levin & H. Sommer, Collier on Bankruptcy ¶105.01[1], p. 105–6 (16th ed. 2023). Purdue concedes this point, Brief for Debtor Respondents 19, n. 5 (Brief for Purdue), as do several other plan proponents, see, *e.g.*, Brief for Respondent Ad Hoc Committee 29. Necessarily, then, our focus trains on §1123(b)(6).

debtor to include in its plan, and a court to order, *any* term not "expressly forbid[den]" by the bankruptcy code as long as a bankruptcy judge deems it "appropriate" and consistent with the broad "purpose[s]" of bankruptcy. 69 F. 4th, at 73–74; *post*, at 41–42 (KAVANAUGH, J., dissenting). And because the code does not expressly forbid a nonconsensual nondebtor discharge, the reasoning goes, the bankruptcy court was free to authorize one here after finding it an "appropriate" provision. See Brief for Sackler Family 19–21; Brief for Purdue 20; *post*, at 13–15.

This understanding of the statute faces an immediate obstacle. Paragraph (6) is a catchall phrase tacked on at the end of a long and detailed list of specific directions. When faced with a catchall phrase like that, courts do not necessarily afford it the broadest possible construction it can bear. *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 512 (2018). Instead, we generally appreciate that the catchall must be interpreted in light of its surrounding context and read to "embrace only objects similar in nature" to the specific examples preceding it. *Ibid.* (internal quotation marks omitted). So, for example, when a statute sets out a list discussing "cars, trucks, motorcycles, or any other vehicles," we appreciate that the catchall phrase may reach similar landbound vehicles (perhaps including buses and camper vans), but it does not reach dissimilar "vehicles" (such as airplanes and submarines). See *McBoyle* v. *United States*, 283 U. S. 25, 26–27 (1931). This ancient interpretive principle, sometimes called the *ejusdem generis* canon, seeks to afford a statute the scope a reasonable reader would attribute to it.

Viewed with that much in mind, we do not think paragraph (6) affords a bankruptcy court the authority the plan proponents suppose. In some circumstances, it may be difficult to discern what a statute's specific listed items share in common. See A. Scalia & B. Garner, Reading Law 207–

208 (2012). But here an obvious link exists: When Congress authorized "appropriate" plan provisions in paragraph (6), it did so only after enumerating five specific sorts of provisions, all of which concern *the debtor*—its rights and responsibilities, and its relationship with its creditors. Doubtless, paragraph (6) operates to confer additional authorities on a bankruptcy court. See *United States* v. *Energy Resources Co.*, 495 U. S. 545, 549 (1990). But the catchall cannot be fairly read to endow a bankruptcy court with the "radically different" power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants. *Epic Systems Corp.*, 584 U. S., at 513; see also *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 645–647 (2012).

The catchall's text underscores the point. Congress could have said in paragraph (6) that "everything not expressly prohibited is permitted." But it didn't. Instead, Congress set out a detailed list of powers, followed by a catchall that it qualified with the term "appropriate." That quintessentially "context dependent" term often draws its meaning from surrounding provisions. *Sossamon* v. *Texas*, 563 U. S. 277, 286 (2011). And we know to look to the statute's preceding specific paragraphs as the relevant "context" here because paragraph (6) tells us so. It permits "any *other* appropriate provision"—that is, "other" than the provisions already discussed in paragraphs (1) through (5). (Emphasis added.) Each of those "other" paragraphs authorizes a bankruptcy court to adjust claims without consent only to the extent such claims concern the debtor. From this, it follows naturally that an "appropriate provision" adopted pursuant to the catchall that purports to extinguish claims without consent should be similarly constrained. See, *e.g.*, *Epic Systems Corp.*, 584 U. S., at 512–513.

For its part, the dissent does not dispute that the *ejusdem generis* canon applies to §1123(b)(6). *Post*, at 33–34; see also Brief for Sackler Family 44; Brief for Purdue 23. But

it disagrees with our application of the canon for two reasons. First, the dissent claims, it "is factually incorrect" to suggest that all the provisions of §1123(b) concern the debtor's rights and responsibilities. *Post*, at 35. The dissent points out that a bankruptcy estate may settle creditors' "derivative claims" against nondebtors under paragraph (3). *Post*, at 36. And this "indisputable point," the dissent declares, "defeats the Court's conclusion that §1123(b)'s provisions relate only to the debtor and do not allow releases of claims that victims and creditors hold against nondebtors." *Post*, at 37; see Brief for Purdue 24–25.

But that argument contains a glaring flaw. The dissent neglects *why* a bankruptcy court may resolve derivative claims under paragraph (3): It may because those claims belong to the debtor's estate. See, *e.g.*, *In re Ontos, Inc.*, 478 F. 3d 427, 433 (CA1 2007). In a derivative action, the named plaintiff "is only a nominal plaintiff. The substantive claim belongs to the corporation." 2 J. Macey, Corporation Laws §13.20[D], p. 13–140 (2020–4 Supp.). And no one questions that Purdue may address in its own bankruptcy plan claims "wherever located and by whomever held," §541(a)—including those claims derivatively asserted by another on its behalf, see §1123(b)(3). The problem is, the Sackler discharge is nothing like that. Rather than seek to resolve claims that substantively belong to Purdue, it seeks to extinguish claims against the Sacklers that belong to their victims. And precisely nothing in §1123(b) suggests those claims can be bargained away without the consent of those affected, as if the claims were somehow Purdue's own property.[3]

_____

[3] In an effort to blur this distinction, the dissent points out that the Sackler discharge covers claims for which Purdue's conduct is a "legally relevant factor." *Post*, at 34–35 (quoting 69 F. 4th, at 80). But that does not alter the fact that the Sackler discharge would extinguish *the victims*' claims against *the Sacklers*. Those claims neither belong to Purdue nor are they asserted against Purdue or its estate. The dissent disregards

Having come up short on the text of §1123(b), the dissent pivots to the statute's purpose. *Post*, at 35. As the dissent sees it, our application of the *ejusdem generis* canon should focus less on the provisions preceding the catchall and more on the overall "purpose of bankruptcy law" in solving "collective-action problem[s]." *Post*, at 5, 35–36; see also Brief for Purdue 21. But there is an obvious difficulty with this approach, too. As this Court has long recognized, "[n]o statute pursues a single policy at all costs." *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 81 (2023). Always, the question we face is *how far* Congress has gone in pursuing one policy or another. See *ibid.* So, yes, bankruptcy law may serve to address some collective-action problems, but no one (save perhaps the dissent) thinks it provides a bankruptcy court with a roving commission to resolve all such problems that happen its way, blind to the role other mechanisms (legislation, class actions, multi-district litigation, consensual settlements, among others) play in addressing them. And here, the five paragraphs that precede the catchall tell us that bankruptcy courts may have many powers, including the power to address certain collective-action problems when they implicate the debtor's rights and responsibilities. But those directions also indicate that a bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors (here, the opioid victims) against other nondebtors (here, the Sacklers).[4]

---

these elemental distinctions. See, *e.g.*, *post*, at 49 (conflating the estate's power to settle its own fraudulent transfer claims against the Sacklers with the power to extinguish those of the victims against the Sacklers).

[4] The dissent characterizes our analysis of paragraph (6) as "breez[y]," as if the analysis would be correct if only it were belabored. *Post*, at 34. And yet it is the dissent that relegates the text of the relevant statute, §1123(b), to a pair of footnotes bookending a 25-page exposition on collective-action problems and public policy, one that precedes any effort to engage with our statutory analysis. See *post*, at 7, n. 1, 32, n. 5.

### B

When resolving a dispute about a statute's meaning, we sometimes look for guidance not just in its immediate terms but in related provisions as well. See, *e.g.*, *Turkiye Halk Bankasi A. S.* v. *United States*, 598 U. S. 264, 275 (2023). Paragraph (6) itself alludes to this fact by instructing that any plan term adopted under its auspices must not be "inconsistent with the applicable provisions of" the bankruptcy code. Following that direction and looking to Chapter 11 more broadly, we find at least three further reasons why §1123(b)(6) cannot bear the interpretation the plan proponents and the dissent would have us give it.

First, consider what is and who can earn a discharge. As we have seen, a discharge releases the debtor from its debts and enjoins future efforts to collect them—even by those who do not assent to the debtor's reorganization plan. §§524(a)(1)–(2), 1129(b)(1), 1141(a). Generally, too, the bankruptcy code reserves this benefit to "the debtor"—the entity that files for bankruptcy. §1141(d)(1)(A); accord, §524(e); see also §§727(a)–(b). The plan proponents and the dissent's reading of §1123(b)(6) would defy these rules by effectively affording to a nondebtor a discharge usually reserved for the debtor alone.

Second, notice how the code constrains the debtor. To win a discharge, again as we have seen, the code generally requires the debtor to come forward with virtually all its assets. §§541(a)(1), 548. Nor is the discharge a debtor receives unbounded. It does not reach claims based on "fraud" or those alleging "willful and malicious injury." §§523(a)(2), (4), (6). And it cannot "affect any right to trial by jury" a creditor may have "with regard to a personal injury or wrongful death tort claim." 28 U. S. C. §1411(a). The plan proponents and the dissent's reading of §1123(b)(6) transgresses all these limits too. The Sacklers have not agreed to place anything approaching their full assets on the table for opioid victims. Yet they seek a judicial order that would

extinguish virtually all claims against them for fraud, willful injury, and even wrongful death, all without the consent of those who have brought and seek to bring such claims. In each of these ways, the Sacklers seek to pay less than the code ordinarily requires and receive more than it normally permits.

Finally, there is a notable exception to the code's general rules. For asbestos-related bankruptcies—and only for such bankruptcies—Congress has provided that, "[n]otwithstanding" the usual rule that a debtor's discharge does not affect the liabilities of others on that same debt, §524(e), courts may issue "an injunction . . . bar[ring] any action directed against a third party" under certain statutorily specified circumstances. §524(g)(4)(A)(ii). That the code *does* authorize courts to enjoin claims against third parties without their consent, but does so in only *one* context, makes it all the more unlikely that §1123(b)(6) is best read to afford courts that same authority in *every* context. See, *e.g.*, *Bittner* v. *United States*, 598 U. S. 85, 94 (2023); *AMG Capital Management, LLC* v. *FTC*, 593 U. S. 67, 77 (2021).[5]

How do the plan proponents and the dissent reply to all this? Essentially, they ask us to look the other way. Whatever limits the code imposes on debtors and discharges mean nothing, they say, because the Sacklers seek a "release," not a "discharge." See, *e.g.*, *post*, at 46–48. But word

—————

[5] The dissent claims that, in making this observation, we defy §524(g)'s directive that "[n]othing in [it], or in the amendments made by [its addition to the bankruptcy code], shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." 108 Stat. 4117, note following 11 U. S. C. §524; see *post*, at 44–45. That charge misunderstands the point. We do not read §524(g) to "impair" or "modify" authority previously available to courts in bankruptcy. To the contrary, we simply understand §524(g) to illustrate how Congress might proceed if it intended to confer upon bankruptcy courts a novel and extraordinary power to extinguish claims against third parties without claimants' consent. See *Czyzewski* v. *Jevic Holding Corp.*, 580 U. S. 451, 465 (2017).

games cannot obscure the underlying reality. Once more, the Sacklers seek greater relief than a bankruptcy discharge normally affords, for they hope to extinguish even claims for wrongful death and fraud, and they seek to do so without putting anything close to all their assets on the table. Nor is what the Sacklers seek a traditional release, for they hope to have a court extinguish claims of opioid victims without their consent. See, *e.g.*, J. Macey, Corporate Governance: Promises Kept, Promises Broken 152 (2008) ("settlements are, by definition, consensual"); accord, *Firefighters* v. *Cleveland*, 478 U. S. 501, 529 (1986). Describe the relief the Sacklers seek how you will, nothing in the bankruptcy code contemplates (much less authorizes) it.

C

If text and context supply two strikes against the plan proponents and the dissent's construction of §1123(b)(6), history offers a third. When Congress enacted the present bankruptcy code in 1978, it did "not write 'on a clean slate.'" *Hall* v. *United States*, 566 U. S. 506, 523 (2012) (quoting *Dewsnup* v. *Timm*, 502 U. S. 410, 419 (1992)). Recognizing as much, this Court has said that pre-code practice may sometimes inform our interpretation of the code's more "ambiguous" provisions. *RadLAX Gateway Hotel*, 566 U. S., at 649.

While we discern no ambiguity in §1123(b)(6) for the reasons explored above, historical practice confirms the lesson we take from it. Every bankruptcy law the parties and their *amici* have pointed us to, from 1800 until 1978, generally reserved the benefits of discharge to the debtor who offered a "fair and full surrender of [its] property." *Sturges* v. *Crowninshield*, 4 Wheat. 122, 176 (1819); accord, *Central Va. Community College* v. *Katz*, 546 U. S. 356, 363–364 (2006); see, *e.g.*, Bankruptcy Act of 1800, §5, 2 Stat. 23 (repealed 1803); Act of Aug. 19, 1841, §3, 5 Stat. 442–443 (repealed 1843); Act of Mar. 2, 1867, §§11, 29, 14 Stat. 521,

531–532 (repealed 1878); Bankruptcy Act of 1898, §§7, 14, 30 Stat. 548, 550 (repealed 1978). No one has directed us to a statute or case suggesting American courts in the past enjoyed the power in bankruptcy to discharge claims brought by nondebtors against other nondebtors, all without the consent of those affected. Surely, if Congress had meant to reshape traditional practice so profoundly in the present bankruptcy code, extending to courts the capacious new power the plan proponents claim, one might have expected it to say so expressly "somewhere in the [c]ode itself." *Dewsnup*, 502 U. S., at 420.[6]

## III

Faced with so many marks against its interpretation of the law, plan proponents and the dissent resort to a policy argument. The Sacklers, they remind us, have signaled that they will not return any funds to Purdue's estate unless the bankruptcy court grants them the sweeping nonconsensual release and injunction they seek. Absent these concessions, plan proponents and the dissent emphatically predict, "there will be no viable path" for victims to recover even $3,500 each. Tr. of Oral Arg. 100; Brief for Sackler Family 27; see Brief for Respondent Official Committee of Unsecured Creditors of Purdue Pharma L. P. et al. 45–46; *post*, at 4, 21–28, 52–54.

The U. S. Trustee disputes that assessment. Yes, he says, reversing the Second Circuit may cause Purdue's current reorganization plan to unravel. But that would also

---

[6] The dissent declares pre-code practice irrelevant to the task at hand and insists the power to order nonconsensual releases has been settled by "decades" of bankruptcy court practice. *Post*, at 3, 5, 8, 11, 50–51. But in resisting the notion that pre-code practice may inform our work, the dissent defies our precedents. And in appealing to "decades" of lower court practice, the dissent seems to forget why we took this case in the first place: to resolve a longstanding and deeply entrenched disagreement between lower courts over the legality of nonconsensual third-party releases. See n. 1, *supra*.

mean the Sacklers would face lawsuits by individual vic-
tims, States, other governmental entities, and perhaps even
fraudulent-transfer claims from the bankruptcy estate.  So
much legal exposure, the Trustee asserts, may induce the
Sacklers to negotiate *consensual* releases on terms more fa-
vorable to opioid victims.  Brief for Petitioner 47–48.  The
Sacklers may "want global peace," the Trustee acknowl-
edges, but that doesn't "mea[n] that they wouldn't pay a lot
for 97.5 percent peace."  Tr. of Oral Arg. 26.  After all, the
Trustee reminds us, during the appeal in this very case, the
Sacklers agreed to increase their contribution by more than
$1 billion in order to secure the consent of the eight object-
ing States.  If past is prologue, the Trustee says, there may
be a better deal on the horizon.[7]

Even putting that aside, the Trustee urges us to consider
the ramifications of this case for others.  Nonconsensual
third-party releases, he observes, allow tortfeasors to win
immunity from the claims of their victims, including for
claims (like wrongful death and fraud) they could not dis-
charge in bankruptcy, and do so without placing anything
approaching all of their assets on the table.  Endorsing that
maneuver, the Trustee says, would provide a "roadmap for
corporations and wealthy individuals to misuse the bank-
ruptcy system" in future cases "to avoid mass-tort liability."
Brief for Petitioner 44–45.

Both sides of this policy debate may have their points.

––––––––––

[7] The parties likewise spar over whether, absent the Sacklers' dis-
charge, the family could deplete the estate by asserting indemnification
claims against the company.  Plan proponents and the dissent point to a
2004 agreement that commits Purdue to cover certain liability and legal
expenses the Sacklers incur.  Brief for Purdue 10; *post*, at 21–24.  But
here again, the Trustee sees things differently.  He underscores the plan
proponents' concession that the 2004 agreement "does not apply if a court
determines the Sacklers 'did not act in good faith.'"  Reply Brief 16.  And,
he adds, bankruptcy courts have a variety of statutory tools at their dis-
posal to disallow or equitably subordinate any potential indemnification
claims the Sacklers might pursue.  *Ibid.* (citing §§502(e)(1)(B), 510(c)(1)).

But, in the end, we are the wrong audience for them. As the people's elected representatives, Members of Congress enjoy the power, consistent with the Constitution, to make policy judgments about the proper scope of a bankruptcy discharge. Someday, Congress may choose to add to the bankruptcy code special rules for opioid-related bankruptcies as it has for asbestos-related cases. Or it may choose not to do so. Either way, if a policy decision like that is to be made, it is for Congress to make. Despite the misimpression left by today's dissent, our only proper task is to interpret and apply the law as we find it; and nothing in present law authorizes the Sackler discharge.

## IV

As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. See, *e.g.*, *In re Specialty Equipment Cos.*, 3 F. 3d 1043, 1047 (CA7 1993). Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor. Additionally, because this case involves only a stayed reorganization plan, we do not address whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated. Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants. Because the Second Circuit ruled otherwise, its judg-

ment is reversed and the case is remanded for further pro-
ceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 23–124

———

## WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, REGION 2, PETITIONER *v.* PURDUE PHARMA L. P., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 27, 2024]

JUSTICE KAVANAUGH, with whom THE CHIEF JUSTICE, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Today's decision is wrong on the law and devastating for more than 100,000 opioid victims and their families. The Court's decision rewrites the text of the U. S. Bankruptcy Code and restricts the long-established authority of bankruptcy courts to fashion fair and equitable relief for mass-tort victims. As a result, opioid victims are now deprived of the substantial monetary recovery that they long fought for and finally secured after years of litigation.

Bankruptcy seeks to solve a collective-action problem and prevent a race to the courthouse by individual creditors who, if successful, could obtain all of a company's assets, leaving nothing for all the other creditors. The bankruptcy system works to preserve a bankrupt company's limited assets and to then fairly and equitably distribute those assets among the creditors—and in mass-tort bankruptcies, among the victims. To do so, the Bankruptcy Code vests bankruptcy courts with broad discretion to approve "appropriate" plan provisions. 11 U. S. C. §1123(b)(6).

In this mass-tort bankruptcy case, the Bankruptcy Court exercised that discretion appropriately—indeed, admirably. It approved a bankruptcy reorganization plan for Purdue Pharma that built up the estate to

approximately $7 billion by securing a $5.5 to $6 billion settlement payment from the Sacklers, who were officers and directors of Purdue. The plan then guaranteed substantial and equitable compensation to Purdue's many victims and creditors, including more than 100,000 individual opioid victims. The plan also provided significant funding for thousands of state and local governments to prevent and treat opioid addiction.

The plan was a shining example of the bankruptcy system at work. Not surprisingly, therefore, virtually all of the opioid victims and creditors in this case fervently support approval of Purdue's bankruptcy reorganization plan. And all 50 state Attorneys General have signed on to the plan—a rare consensus. The only relevant exceptions to the nearly universal desire for plan approval are a small group of Canadian creditors and one lone individual.

But the Court now throws out the plan—and in doing so, categorically prohibits non-debtor releases, which have long been a critical tool for bankruptcy courts to manage mass-tort bankruptcies like this one. The Court's decision finds no mooring in the Bankruptcy Code. Under the Code, all agree that a bankruptcy plan can nonconsensually release victims' and creditors' claims *against a bankrupt company*—here, against Purdue. Yet the Court today says that a plan can *never* release victims' and creditors' claims *against non-debtor officers and directors of the company*—here, against the Sacklers.

That is true, the Court says, even when (as here) those non-debtor releases are necessary to facilitate a fair settlement with the officers and directors and produce a significantly larger bankruptcy estate that can be fairly and equitably distributed among the victims and creditors. And that is true, the Court also says, even when (as here) those officers and directors are indemnified by the company. When officers and directors are indemnified by the company, a victim's or creditor's claim against the non-

debtors "is, in essence, a suit against the debtor" that could "deplete the assets of the estate" for the benefit of only a few, just like a claim against the company itself. *In re Purdue Pharma L. P.*, 69 F. 4th 45, 78 (CA2 2023) (quotation marks omitted).

It therefore makes little legal, practical, or economic sense to say, as the Court does, that the victims' and creditors' claims against the debtor can be released, but that it would be categorically "inappropriate" to release their identical claims against non-debtors even when they are indemnified or when the release generates a significant settlement payment by the non-debtor to the estate.

For decades, bankruptcy courts and courts of appeals have determined that non-debtor releases can be appropriate and essential in mass-tort cases like this one. Non-debtor releases have enabled substantial and equitable relief to victims in cases ranging from asbestos, Dalkon Shield, and Dow Corning silicone breast implants to the Catholic Church and the Boy Scouts. As leading scholars on bankruptcy explain, "the bankruptcy community has recognized the resolution of mass tort claims as a widely accepted core function of bankruptcy courts for decades"—and they emphasize that a "key feature in every mass tort bankruptcy" has been the non-debtor release. A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 974, 977 (2023).

No longer.

Given the broad statutory text—"appropriate"—and the history of bankruptcy practice approving non-debtor releases in mass-tort bankruptcies, there is no good reason for the debilitating effects that the decision today imposes on the opioid victims in this case and on the bankruptcy system at large. To be sure, many Americans have deep hostility toward the Sacklers. But allowing that animosity to infect this bankruptcy case is entirely misdirected and counterproductive, and just piles even more injury onto the

opioid victims. And no one can have more hostility toward the Sacklers and a greater desire to go after the Sacklers' assets than the opioid victims themselves. Yet the victims unequivocally seek approval *of this plan*.

With the current plan now gone and non-debtor releases categorically prohibited, the consequences will be severe, as the victims and creditors forcefully explained. Without releases, there will be no $5.5 to $6 billion settlement payment to the estate, and "there will be no viable path to any victim recovery." Tr. of Oral Arg. 100. And without the plan's substantial funding to prevent and treat opioid addiction, the victims and creditors bluntly described further repercussions: "more people will die without this Plan." Brief for Respondent Official Committee of Unsecured Creditors of Purdue Pharma L. P. et al. 55.

In short: Despite the broad term "appropriate" in the statutory text, despite the longstanding precedents approving mass-tort bankruptcy plans with non-debtor releases like these, despite 50 state Attorneys General signing on, and despite the pleas of the opioid victims, today's decision creates a new atextual restriction on the authority of bankruptcy courts to approve appropriate plan provisions. The opioid victims and their families are deprived of their hard-won relief. And the communities devastated by the opioid crisis are deprived of the funding needed to help prevent and treat opioid addiction. As a result of the Court's decision, each victim and creditor receives the essential equivalent of a lottery ticket for a possible future recovery for (at most) a few of them. And as the Bankruptcy Court explained, without the non-debtor releases, there is no good reason to believe that any of the victims or state or local governments will ever recover anything. I respectfully but emphatically dissent.

## I

To map out this dissent for the reader: Part I (pages 5 to 18) discusses why non-debtor releases are often appropriate and essential, particularly in mass-tort bankruptcies. Part II (pages 18 to 31) explains why non-debtor releases were appropriate and essential in the Purdue bankruptcy. Part III (pages 31 to 52) engages the Court's contrary arguments and why I respectfully disagree with those arguments. Part IV (pages 52 to 54) sums up.

Throughout this opinion, keep in mind the goal of bankruptcy. The bankruptcy system is designed to preserve the debtor's estate so as to ensure fair and equitable recovery for creditors. Bankruptcy courts achieve that overarching objective by, among other things, releasing claims that otherwise could deplete the estate for the benefit of only a few and leave all the other creditors with nothing. And as courts have recognized for decades, especially in mass-tort cases, non-debtor releases are not merely "appropriate," but can be absolutely critical to achieving the goal of bankruptcy—fair and equitable recovery for victims and creditors.

## A

Article I, §8, of the Constitution affords Congress power to establish "uniform Laws on the subject of Bankruptcies throughout the United States" and to "make all Laws which shall be necessary and proper for carrying into Execution" that power.

Early in the Nation's history, Congress established the bankruptcy system. In 1978, Congress significantly revamped and reenacted the Bankruptcy Code in its current form. Bankruptcy Code of 1978, 92 Stat. 2549.

The purpose of bankruptcy law is to address the collective-action problem that a bankruptcy poses. T. Jackson, The Logic and Limits of Bankruptcy Law 12–13 (1986). When a company's liabilities exceed its ability to

pay creditors, every creditor has an incentive to maximize its own recovery before other creditors deplete the pot. Without a mandatory collective system, the creditors would race to the courthouse to recover first. One or a few successful creditors could then recover substantial funds, deplete the assets, and drive the company under—leaving other creditors with nothing. See *id.*, at 7–19; D. Baird, A World Without Bankruptcy, 50 Law & Contemp. Prob. 173, 183–184 (1987); T. Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain, 91 Yale L. J. 857, 860–868 (1982).

Bankruptcy creates a way for creditors to "act as one, by imposing a *collective* and *compulsory* proceeding on them." Jackson, Logic and Limits of Bankruptcy Law, at 13. One of the goals of Chapter 11 of the Bankruptcy Code in particular is to fairly distribute estate assets among creditors "in order to prevent a race to the courthouse to dismember the debtor." 7 Collier on Bankruptcy ¶1100.01, p. 1100–3 (R. Levin & H. Sommer eds., 16th ed. 2023). Chapter 11 is aimed at preserving an estate's value for distribution to creditors in the face of that collective-action problem.

The basic Chapter 11 case runs as follows. After the debtor files for bankruptcy under Chapter 11, the debtor's property becomes property of the bankruptcy estate. 11 U. S. C. §541. Any litigation that might interfere with the property of the estate is subject to an automatic stay, thus preventing creditors from skipping the line by litigating in a separate forum against the debtor while the bankruptcy is ongoing. §362.

With litigation paused, the parties craft a plan of reorganization for the debtor. The Code grants the bankruptcy court sweeping powers to reorganize the debtor company and ensure fair and equitable recovery for the creditors. For example, the plan may authorize selling or retaining the company's property; merging or consolidating

the company; or amending the company's charter. §1123(a)(5). The subsection at issue here, §1123(b), also authorizes many other kinds of provisions that bankruptcy plans may include.[1] Most relevant for this case, as I will explain, the reorganization plan may impair and release "any class of claims" that creditors hold against the debtor. §1123(b)(1). The plan may also settle and release "any claim or interest" that the debtor company holds against non-debtors. §1123(b)(3). And the plan may include "any other appropriate provision not inconsistent with the applicable provisions" of the Bankruptcy Code. §1123(b)(6).

To address any collective-action or holdout problem, the bankruptcy court has the power to approve a reorganization plan even without the consent of every creditor. If creditors holding more than one-half in number (and at least two-thirds in amount) of the claims in every class accept the plan, the court can confirm the plan. §§1126(c), 1129(a)(8)(A). A plan is "said to be confirmed consensually

_____

[1] The full text of §1123(b) provides that "a plan may—

"(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

"(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

"(3) provide for—

"(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

"(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

"(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

"(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

"(6) include any other appropriate provision not inconsistent with the applicable provisions of this title."

if all classes of creditors vote in favor, even if some classes have dissenting creditors." 7 Collier, Bankruptcy ¶1129.01, at 1129–13. That the bankruptcy system considers a plan with majority (even if not unanimous) support to be "consensual" underscores that the bankruptcy system is designed to benefit creditors collectively and prevent holdout problems.

Confirmation of the plan "generally discharges the debtor from all debts that arose before confirmation." *Id.*, ¶1100.09[2][f], at 1100–42 (citing §1141(d)). And all creditors are bound by the plan's distribution, even if some creditors are not happy and oppose the plan. *Ibid.*

B

This is a mass-tort bankruptcy case. Mass-tort cases present the same collective-action problem that bankruptcy was designed to address. "Without a mandatory rule that consolidates claims in a single tribunal, tort claimants would rationally enter a race to the courthouse." A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 997 (2023). And the "plaintiffs who bring successful suits earlier are likely to drain the firm's resources, while inconsistent judgments could result in inequitable payouts even among plaintiffs who ultimately do collect." *Id.*, at 994.

For many decades now, bankruptcy law has stepped in as a coordinating tribunal in significant mass-tort cases. When a company that is liable for mass torts files for bankruptcy, the bankruptcy system enables (and requires) the mass-tort victims who are seeking relief from the bankrupt company to work together to reach a fair and equitable distribution of the company's assets.

In many cases, there is no workable alternative other than bankruptcy for achieving fair and equitable recovery for mass-tort victims. "Outside of bankruptcy," victims face "significant administrative costs" of multi-district

litigation, "which has limited coordination mechanisms and no tools for binding future claimants." *Id.*, at 1005. And multi-district litigation cannot "solve the collective action problem because dissenting claimants can opt out of settlements even when super majorities favor them." *Ibid.*

Bankruptcy, on the other hand, reduces administrative costs and allows all of the affected parties to come together, pause litigation elsewhere, invoke procedural safeguards including discovery, and reach a collective resolution that considers both current and future victims. Cf. Federal Judicial Center, E. Gibson, Case Studies of Mass Tort Limited Fund Class Action Settlements & Bankruptcy Reorganizations 6 (2000) ("bankruptcy reorganizations provide an inherently fairer method of resolving mass tort claims" than alternative of class-action settlements).

In some cases—including mass-tort cases—it is not only the debtor company, but rather another closely related person or entity such as officers and directors (non-debtors), who may hold valuable assets and also be potentially liable for the company's wrongdoing.

But it may be uncertain whether the victims can recover in tort suits against the non-debtors due to legal hurdles or difficulty reaching the non-debtors' assets. In those cases, a settlement may be reached: In exchange for being released from potential liability for any wrongdoing, the non-debtor must make substantial payments to the company's bankruptcy estate in order to compensate victims. As long as the settlement is fair, the non-debtor's settlement payment will benefit victims "by enlarging the pie of recoverable funds" in the bankruptcy estate. Casey & Macey, 90 U. Chi. L. Rev., at 1001. And it will reduce administrative costs, because the victims' claims against both the debtor and the non-debtor may be resolved "at the same time and in the same tribunal." *Id.*, at 1002.

The non-debtor's settlement payment into the estate can also solve a collective-action problem. Bringing the non-

debtor's assets into the bankruptcy estate enables those assets to be distributed fairly and equitably among victims, rather than swallowed up by the first victim to successfully sue the non-debtor. *Id.*, at 1002–1003.

A separate collective-action problem can arise when the insolvent company's officers and directors are indemnified by the company for liability arising out of their job duties. In such cases, "a suit against the non-debtor is, in essence, a suit against the debtor." *In re Purdue Pharma L. P.,* 69 F. 4th 45, 78 (CA2 2023) (quotation marks omitted). If not barred from doing so, the creditors could race to the courthouse against the indemnified officers and directors for basically the same claims that they hold against the debtor company. If successful, such suits would deplete the company's assets because a judgment against the indemnified officers and directors would likely come out of the debtor company's assets.

Another similar collective-action problem can involve liability insurance, a kind of indemnification relationship where the insurer is on the hook for tort victims' claims against the debtor company. See B. Zaretsky, Insurance Proceeds in Bankruptcy, 55 Brooklyn L. Rev. 373, 375–376 (1989). The insurance assets—meaning assets to the limits of the debtor's insurance coverage—are usually a key asset for the bankruptcy estate to compensate victims. But tort victims also "may have direct action rights against the insurance carrier, even, in some cases, bypassing the debtor-insured." 5 Collier, Bankruptcy ¶541.10[3], at 541–60. If victims brought their claims directly against the insurer for the same claims that they hold against the estate, one group of victims could obtain from the insurer the full amount of the debtor's coverage. That would obviously prevent the insurance money from being used as part of the bankruptcy estate. See Zaretsky, 55 Brooklyn L. Rev., at 376–377, 394–395.

To address those various collective-action problems, bankruptcy courts have long found non-debtor releases to be appropriate in certain complex bankruptcy cases, especially in mass-tort bankruptcies. Indeed, that is precisely why non-debtor releases emerged in asbestos mass-tort bankruptcies in the 1980s. See *id.*, at 405–414; Casey & Macey, 90 U. Chi. L. Rev., at 998–999; see, *e.g.*, *MacArthur Co.* v. *Johns-Manville Corp.*, 837 F. 2d 89 (CA2 1988). And that is precisely why non-debtor releases have become such a well-established tool in mass-tort bankruptcies in the decades since.

For example, after A. H. Robins declared bankruptcy in 1985 in the face of massive tort liability for injuries from its defective intrauterine device, the Dalkon Shield, nearly 200,000 victims filed proof of claims. *In re A. H. Robins Co.*, 88 B. R. 742, 743–744, 747 (ED Va. 1988), aff'd, 880 F. 2d 694 (CA4 1989). A plan provision releasing the company's directors and insurance company ensured that the estate would not be depleted through indemnity or contribution claims, or claims brought directly against the directors or insurer. 88 B. R., at 751; 880 F. 2d, at 700–702. Preventing the victims from engaging in "piecemeal litigation" against the non-debtor directors and insurance company was the only way to ensure "equality of treatment of similarly situated creditors." 88 B. R., at 751. Therefore, the Bankruptcy Court found (and the Fourth Circuit agreed) that the release was "necessary and essential" to the bankruptcy's success. *Ibid.*; see 880 F. 2d, at 701–702. The plan ultimately provided for the victims to recover in full, and they overwhelmingly approved the plan. *Id.*, at 700–701.

A non-debtor release provision was similarly essential to resolve hundreds of thousands of victims' tort claims against Dow Corning Corporation, which declared bankruptcy in 1995 in the face of liability for its defective silicone breast implants. See *In re Dow Corning Corp.*, 287

B. R. 396, 397 (ED Mich. 2002). The non-debtor release provision prevented the victims from suing Dow Corning's insurers and shareholders for their tort claims—which would have depleted Dow Corning's shared insurance assets and other estate assets. *Id.*, at 402–403, 406–408. The non-debtor release provision was "essential" to the bankruptcy reorganization because the reorganization hinged "on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor." *In re Dow Corning Corp.*, 280 F. 3d 648, 658 (CA6 2002); 287 B. R., at 410–413.

The need for such a tool to deal with complex bankruptcy cases has not gone away. Far from it. Indeed, without the option of bankruptcy with non-debtor releases, "tort victims in several recent high-profile cases would have received less compensation; the compensation would have been unfairly distributed; and the administrative costs of resolving their claims would have been higher." Casey & Macey, 90 U. Chi. L. Rev., at 979; see also Brief for Law Professors in Support of Respondents as *Amici Curiae* 21–25; Brief for Certain Former Commissioners of the American Bankruptcy Institute's Commission To Study the Reform of Chapter 11 as *Amici Curiae* 9–11; Brief for Association of the Bar of the City of New York as *Amicus Curiae* 9, 11–15.

Consider two recent examples that ensured recovery for the victims of torts committed by the Boy Scouts of America and by several dioceses of the Catholic Church. In both cases, a national or regional organization was the debtor in the bankruptcy. But that organization shared its liability and its insurance policy with numerous other legally separate and autonomous local entities. Without a coordinating mechanism, a victim's (or group of victims') recovery against one local entity could have eaten up all of the shared insurance assets, leaving all of the other victims with nothing. Brief for Boy Scouts of America as *Amicus*

*Curiae* 9–14, 17–19; Brief for U. S. Conference of Catholic Bishops as *Amicus Curiae* 9–22.

Bankruptcy provided a forum to coordinate liability and insurance assets. A non-debtor release provision prevented victims from litigating outside of the bankruptcy plan's procedures. And the provision therefore prevented one victim or group of victims from obtaining all of the insurance funds before other victims recovered. As a result, in each case, the local entities were able to pool their resources to create a substantial fund in a single bankruptcy estate to compensate victims substantially and fairly. Brief for Boy Scouts of America as *Amicus Curiae* 11–12, 20–21; Brief for Ad Hoc Group of Local Councils of the Boy Scouts of America as *Amicus Curiae* 5–6; Brief for U. S. Conference of Catholic Bishops as *Amicus Curiae* 15–16.

As those examples show, in some cases where various closely related but distinct parties share liability or share assets (or both), bankruptcy "provides the *only* forum in the U. S. legal system where a unified and complete resolution of mass-tort cases can reliably occur in a manner that results in a fair recovery and distribution for all claimants." Brief for Association of the Bar of the City of New York as *Amicus Curiae* 15. And the bankruptcy system could not do so without non-debtor releases.

C

The Bankruptcy Code gives bankruptcy courts authority to approve non-debtor releases to solve the complex collective-action problems that such cases present. As noted above, a Chapter 11 reorganization plan may release creditor claims against debtors. §1123(b)(1). And a plan may settle and release debtor claims against non-debtors. §1123(b)(3).

In addition, the plan may also include "any other appropriate provision not inconsistent with the applicable

provisions of" the Code. §1123(b)(6). Section 1123(b)(6) provides ample flexibility for the reorganization plan to settle and release creditor claims against non-debtors who are closely related to the debtor. For example, officers and directors may be indemnified by the debtor company; in those cases, creditor claims against indemnified non-debtors are essentially the same as creditor claims against the debtor business itself. Or the non-debtors may reach a settlement with the victims and creditors where the non-debtors pay a settlement amount to the estate, which in some cases may be the only way to ensure fair and equitable recovery for the victims and creditors. The non-debtor releases—just like debtor releases under §1123(b)(1) and non-debtor releases under §1123(b)(3)—can be essential to preserve and increase the estate's assets and can be essential to ensure fair and equitable victim and creditor recovery.

The key statutory term in §1123(b)(6) is "appropriate." As this Court has often said, "appropriate" is a "broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan* v. *EPA*, 576 U. S. 743, 752 (2015) (quotation marks omitted). Because determining propriety requires exercising judgment, the inquiry must include a degree of "flexibility." *Ibid.* The Court has explained on numerous occasions that the "ordinary meaning" of a statute authorizing appropriate relief "confers broad discretion" on a court. *School Comm. of Burlington* v. *Department of Ed. of Mass.*, 471 U. S. 359, 369 (1985); see also, *e.g.*, *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 446 (1986) (plurality opinion) (Title VII "vest[s] district courts with broad discretion to award 'appropriate' equitable relief"); *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 400 (1990) ("In directing the district court to impose an 'appropriate' sanction, Rule 11 itself indicates that the district court is empowered to exercise its discretion"). Because the

"language is open-ended on its face," whether a provision is "appropriate is inherently context dependent." *Tanzin* v. *Tanvir*, 592 U. S. 43, 49 (2020) (quotation marks omitted).

By allowing "any other appropriate provision," §1123(b)(6) empowers a bankruptcy court to exercise reasonable discretion. That §1123 confers broad discretion makes eminent sense, given "the policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code." *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 525 (1984). Such flexibility is important to achieve Chapter 11's ever-elusive goal of ensuring fair and equitable recovery to creditors. See §§1129(a)(7), (b)(1).

The catchall authority in Chapter 11 therefore empowers a bankruptcy court to exercise its discretion to deal with complex scenarios, like the collective-action problems that plague mass-tort bankruptcies. Non-debtor releases are often appropriate—indeed are essential—in such circumstances.

And courts have therefore long found non-debtor releases to be appropriate in certain narrow circumstances under §1123(b)(6). Indeed, courts have been approving such non-debtor releases almost as long as the current Bankruptcy Code has existed since its enactment in 1978. See, *e.g.*, *In re Johns-Manville Corp.*, 68 B. R. 618, 624–626 (Bkrtcy. Ct. SDNY 1986), aff'd, 837 F. 2d, at 90; *A. H. Robins Co.*, 88 B. R., at 751, aff'd, 880 F. 2d, at 696. Historical and contemporary practice demonstrate that non-debtor releases are especially appropriate when (as here) non-debtor releases and corresponding settlement payments preserve and increase the debtor's estate and thereby ensure fair and equitable recovery for creditors.

Over those decades of practice, courts have developed and applied numerous factors for determining whether a non-debtor release is "appropriate" in a given case. §1123(b)(6); see H. Friendly, Indiscretion About Discretion, 31 Emory L. J. 747, 771–773 (1982) (noting the common-law-like

process by which factors important to a discretionary decision develop over time).  Those factors reflect the fact that determining whether a non-debtor release is "appropriate" is a holistic inquiry that depends on the precise facts and circumstances of each case.  And the factors have served to confine the use of non-debtor releases to well-defined and narrow circumstances—precisely those circumstances where the collective-action problems arise.

For instance, since the 1980s, the Second Circuit has been a leader on the non-debtor release issue.  See, *e.g.*, *Johns-Manville Corp.*, 837 F. 2d 89 (1988); *In re Drexel Burnham Lambert Group, Inc.*, 960 F. 2d 285 (1992); *In re Metromedia Fiber Network, Inc.*, 416 F. 3d 136 (2005).  Over time, the Second Circuit has developed a non-exhaustive list of factors for determining whether a non-debtor release is appropriately employed and appropriately tailored in a given case.

First, and critically, the court must determine whether the released party is closely related to the debtor—for example, through an indemnification agreement—where "a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate."  69 F. 4th, at 78 (quotation marks omitted).  Second, the court must determine if the claims against the non-debtor are "factually and legally intertwined" with claims against the debtor.  *Ibid.*  Third, the court must ensure that the "scope of the releases" is tailored to only the claims that must be released to protect the plan.  *Ibid.*  Fourth, even then, the court should approve the release only if it is truly "essential" to the plan's success and the reorganization would fail without it.  *Ibid.*  Fifth, the court must consider whether, as part of the settlement, the non-debtor party has paid "substantial assets" to the estate.  *Ibid.*  Sixth, the court should determine if the plan provides "fair payment" to creditors for their released claims.  *Id.*, at 79.  Seventh, the court must ensure that the creditors "overwhelmingly"

approve of the release, which the Second Circuit defined as a 75 percent "bare minimum." *Id.*, at 78–79 (quotation marks omitted).[2]

Factors one through four ensure that the releases are necessary to solve collective-action problems that threaten the bankruptcy and prevent fair and equitable recovery for the victims and creditors. Factor five makes sure that the releases are not a free ride for the non-debtor. Factor six ensures that the victims and creditors receive fair compensation. Together, factors five and six assess whether there has been a fair settlement given the probability of victims' and creditors' recovery from the non-debtor and the likely amount of any such recovery. And factor seven ensures that the vast majority of victims and creditors approve, meaning that the release is solving a holdout problem.

As the Courts of Appeals' comprehensive factors illustrate, §1123(b)(6) limits a bankruptcy court's authority in important respects. A non-debtor release must be "appropriate" given all of the facts and circumstances of the case. And as the history of non-debtor releases illustrates, the appropriateness requirement confines the use of non-debtor releases to narrow and relatively rare circumstances where the releases are necessary to help victims and creditors achieve fair and equitable recovery.

As long as every class of victims and creditors supports the plan by a majority vote in number and at least a two-thirds vote in amount, the plan is "said to be confirmed consensually," "even if some classes have dissenting creditors." 7 Collier, Bankruptcy ¶1129.01, at 1129–13. And the Courts of Appeals have allowed non-debtor

---

[2] Other Courts of Appeals have used similar factors for evaluating non-debtor releases. See, *e.g.*, *In re Seaside Engineering & Surveying, Inc.*, 780 F. 3d 1070, 1079–1081 (CA11 2015); *National Heritage Foundation, Inc.* v. *Highbourne Foundation*, 760 F. 3d 344, 347–351 (CA4 2014); *In re Dow Corning Corp.*, 280 F. 3d 648, 658–661 (CA6 2002).

releases only when there is an even higher level of supermajority victim and creditor approval. In the mass-tort bankruptcy cases, most plans have easily cleared that bar and received close to 100 percent approval. *E.g.*, *Johns-Manville Corp.*, 68 B. R., at 631 (95 percent approval); *A. H. Robins Co.*, 880 F. 2d, at 700 (over 94 percent approval); *Dow Corning*, 287 B. R., at 413 (over 94 percent approval); 69 F. 4th, at 82 (over 95 percent approval here). So in reality, as opposed to rhetoric, the non-debtor releases in mass-tort bankruptcy plans, including this one, have been approved by all but a comparatively small group of victims and creditors.

In every bankruptcy of this kind, moreover, the plan nonconsensually releases victims' and creditors' claims *against the debtor*. The only difference with non-debtor releases is that they release victims' and creditors' claims not against the debtor but rather against non-debtors who are closely related to the debtor, such as indemnified officers and directors.

## II

In this case, as in many past mass-tort bankruptcies, the non-debtor releases were appropriate and therefore authorized by 11 U. S. C. §1123(b)(6) of the Code. The non-debtor releases were needed to ensure meaningful victim and creditor recovery in the face of multiple collective-action problems.

## A

Purdue Pharma was a pharmaceutical company owned and directed by the extended Sackler family. Brothers Arthur, Mortimer, and Raymond Sackler purchased the company in 1952. Since then, Purdue has been wholly owned by entities and trusts established for the benefit of Mortimer Sackler's and Raymond Sackler's families and

descendants, and those families also closely controlled Purdue's operations.

In the 1990s, Purdue developed the drug OxyContin, a powerful and addictive opioid painkiller. Purdue aggressively marketed that drug and downplayed or hid its addictive qualities. OxyContin helped people to manage pain. But the drug's addictive qualities led to its widespread abuse. OxyContin played a central role in the opioid-abuse crisis from which millions of Americans and their families continue to suffer.

Starting in the early 2000s, governments and individual plaintiffs began to sue Purdue for the harm caused by OxyContin. In 2007, Purdue settled large swaths of those claims and pled guilty to felony misbranding of OxyContin.

But within the next decade, victims of the opioid crisis and their families, along with state and local governments fighting the crisis, began filing a new wave of lawsuits, this time also naming members of the Sackler family as defendants. Today, those claims amount to more than $40 *trillion* worth of alleged damages against Purdue and the Sacklers. (For perspective, $40 trillion is about seven times the total annual spending of the U. S. Government.)

As the litigation by victims and state and local governments mounted, the U. S. Government then brought federal criminal and civil charges against Purdue. The U. S. Government has not brought criminal charges against any of the Sacklers individually. Nor have any States brought criminal charges against any of the Sacklers individually.

As to the criminal charges against Purdue, the company pled guilty to conspiracy to defraud the United States, to violate the Food, Drug, and Cosmetic Act, and to violate the federal anti-kickback statute. As part of the global resolution of the charges, Purdue agreed to a $2 billion judgment to the U. S. Government that would be "deemed to have the status of an allowed superpriority" claim in

bankruptcy. 17 App. in No. 22–110 etc. (CA2), p. 4804. The U. S. Government agreed not to "initiate any further criminal charges against Purdue." 16 *id.,* at 4798.

Unable to pay its colossal potential liabilities, Purdue filed for bankruptcy under Chapter 11 of the Bankruptcy Code. The ensuing case exemplified the flexibility and common sense of the bankruptcy system at work.

The proceedings were extraordinarily complex. The case involved "likely the largest creditor body ever," and the number of claims filed—totaling more than 600,000—was likely "a record." *In re Purdue Pharma L. P.*, 633 B. R. 53, 58 (Bkrtcy. Ct. SDNY 2021). Further complicating matters was the need to allocate funds between, on the one hand, individual victims and the hospitals that urgently needed relief and, on the other hand, government entities at all levels that urgently needed funds for opioid crisis prevention and treatment efforts. *Id.*, at 83.

Aided by perhaps "the most extensive discovery process" that "any court in bankruptcy has ever seen," the parties engaged in prolonged arms-length negotiations. *Id.*, at 85–86. They ultimately agreed on a multi-faceted compensation plan for the victims and creditors and reorganization plan for Purdue. Under that plan, Purdue would cease to exist and would be replaced with a new company that would manufacture opioid-abatement medications. And approximately $7 billion would be distributed among nine trusts to compensate victims and creditors and to fund efforts to abate the opioid crisis by preventing and treating addiction.

To determine how to allocate the $7 billion, the victims and creditors then engaged in a series of "heavily negotiated and intricately woven compromises" and devised a "complex allocation" of the funds to different classes of victims and creditors. *Id.*, at 83, 90. In the end, more than 95 percent of voting victims and creditors approved of the distribution scheme.

That plan would distribute billions of dollars to communities to use exclusively for prevention and treatment programs. And $700 to $750 million was set aside to compensate individual tort victims and their families. 1 App. 561. Opioid victims and their families would each receive somewhere between $3,500 and $48,000 depending on the category of claim and level of harm. *Id.*, at 573–584; 6 App. in No. 22–110 etc. (CA2), at 1695.

## B

Under the reorganization plan, victims' and creditors' claims *against Purdue Pharma* were released (even if some victims and creditors did not consent). As in other mass-tort bankruptcies described above, a related and equally essential facet of the Purdue plan was the non-debtor release provision. Under that provision, the victims' and creditors' claims *against the Sacklers* were also released. As a result, Purdue's victims and creditors could not later sue either Purdue Pharma or members of the Sackler family (the officers and directors of Purdue Pharma) for Purdue's and the Sacklers' opioid-related activities.

The non-debtor release provision prevented a race to the courthouse against the Sacklers. As a result, the non-debtor release provision solved two separate collective-action problems that dogged Purdue's mass-tort bankruptcy: (i) It protected Purdue's estate from the risk of being depleted by indemnification claims, and (ii) it operated as a settlement of potential claims against the Sacklers and thus enabled the Sacklers' large settlement payment to the estate. That settlement payment in turn quadrupled the amount in the Purdue estate and enabled substantially greater recovery for the victims.

I will now explain both of those important points in some detail.

*First*, and critical to a proper understanding of this case, the non-debtor release provision was essential to *preserve*

Purdue's existing assets. By preserving the estate, the non-debtor release provision ensured that the assets could be fairly and equitably apportioned among all victims and creditors rather than devoured by one group of potential plaintiffs.

How? Pursuant to a 2004 indemnification agreement, Purdue had agreed to pay for liability and legal expenses that officers and directors of Purdue faced for decisions related to Purdue, including opioid-related decisions. See *In re Purdue Pharma L. P.*, 69 F. 4th 45, 58–59 (CA2 2023). That indemnification agreement covered judgments against the Sacklers and related legal expenses.

As explained above, the Sacklers wholly owned and controlled Purdue, a closely held corporation. The Sacklers "took a major role" in running Purdue, including making decisions about "Purdue's practices regarding its opioid products." 633 B. R., at 93. In short, the Sacklers potentially shared much of the liability that Purdue faced for Purdue's opioid practices. See *In re Purdue Pharma, L. P.*, 635 B. R. 26, 87 (SDNY 2021) (claims against the Sacklers are "deeply connected with, if not entirely identical to," claims against Purdue (quotation marks omitted)); see also 633 B. R., at 108.

But due to the indemnification agreement, if victims and creditors were to sue the Sacklers directly for claims related to Purdue or opioids, the Sacklers would have a reasonable basis to seek reimbursement from Purdue for liability and litigation costs. So Purdue could potentially be on the hook for a substantial amount of the Sacklers' liability and litigation costs. In such indemnification relationships, "a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." 69 F. 4th, at 78 (quotation marks omitted).

As a real-world matter, therefore, opioid-related claims *against the Sacklers* could come out of the same pot of Purdue money as opioid-related claims *against Purdue.* So

releasing claims against the Sacklers is not meaningfully different from releasing claims against Purdue itself, which the bankruptcy plan here of course also mandated. Both sets of releases were necessary to preserve Purdue's estate so that it was available for all victims and creditors to recover fairly and equitably. Otherwise, the estate could be zeroed out: A few victims or creditors could race to the courthouse and obtain recovery from Purdue or the Sacklers (ultimately the same pot of money) and thereby deplete the assets of the company and leave nothing for everyone else.

To fully understand why both sets of releases were necessary—against Purdue and against the Sacklers—suppose that the plan did *not* release the Sacklers from opioid- and Purdue-related liability. Victims' and creditors' opioid-related claims *against Purdue* would be discharged in Purdue's bankruptcy (even without their consent). But any victims or creditors could still sue *the Sacklers* for essentially the same claims.

Suppose that a State or a group of victims sued the Sacklers and received a large reward. The Sacklers "would have a reasonable basis to seek indemnification" from Purdue for judgments and legal expenses. *Id.*, at 72. Therefore, any liability judgments and litigation costs for certain plaintiffs in their suits *against the Sacklers* could "deplete the *res*" of *Purdue's* bankruptcy—meaning that there might well be nothing left for all of the other victims and creditors. *Id.*, at 80. Even if the Sacklers' indemnification claims against Purdue were unsuccessful, Purdue would "be required to litigate" those claims, which would likely diminish the *res*, "no matter the ultimate outcome of those claims." *Ibid.*

Every victim and creditor knows that a single judgment by someone else against the Sacklers could deplete the Purdue estate and leave nothing for anyone else. So every victim and creditor would have an incentive to race to the

courthouse to sue the Sacklers.  A classic collective-action problem.

The non-debtor releases of claims against the Sacklers prevented that collective-action problem in the same way that the releases of claims against Purdue itself prevented the identical collective-action problem.  Both protected Purdue's assets from being consumed by the first to sue successfully.  And the non-debtor releases were narrowly tailored to the problem.  The non-debtor releases enjoined victims and creditors from bringing claims against the Sacklers only in cases where Purdue's conduct, or the victims' or creditors' claims asserted against Purdue, was a legal cause or a legally relevant factor to the cause of action against the Sacklers.  633 B. R., at 97–98 (defining the release to encompass only claims that "directly affect the *res* of the Debtors' estates," such as claims that would trigger the Sacklers' "rights to indemnification and contribution"); see also *id*., at 105.  In other words, the releases applied only to claims for which the Sacklers had a reasonable basis to seek coverage or reimbursement from Purdue.

The non-debtor release provision therefore released claims against the Sacklers that are essentially the same as claims against Purdue.  Doing so preserved Purdue's bankruptcy estate so that it could be fairly apportioned among the victims and creditors.

*Second*, the non-debtor releases not only *preserved* the existing Purdue estate; those non-debtor releases also greatly *increased* the funds in the Purdue estate so that the victims and creditors could receive greater compensation.

Standing alone, Purdue's estate is estimated to be worth approximately $1.8 billion—a small fraction of the sizable claims against Purdue.  *Id*., at 90; 22 App. in No. 22–110 etc. (CA2), at 6507.  If that were all the money on the table, the Bankruptcy Court found, the victims and creditors "would probably recover nothing" from Purdue's estate.  633

B. R., at 109. That is because the United States holds a $2 billion "superpriority" claim, meaning that the United States would be first in line to recover ahead of all of the victims and other creditors. The United States' claim would wipe out Purdue's entire $1.8 billion value. "As a result, many victims of the opioid crisis would go without any assistance." 69 F. 4th, at 80.

So for the victims and other creditors to have any hope of meaningful recovery, Purdue's bankruptcy estate needed more funds.

Where to find those funds? The Sacklers' assets were the answer. After vigorous negotiations, a settlement was reached: In exchange for the releases, the Sacklers ultimately agreed to make significant payments to Purdue's estate—between $5.5 and $6 billion. Adding that substantial amount to Purdue's comparatively smaller bankruptcy estate enabled Purdue's reorganization plan to distribute an estimated $7 billion or more to the victims and creditors—thereby quadrupling the size of the estate available for distribution. With that enhanced estate, the plan garnered 95 percent support from the voting victims and creditors. That high level of support tends to show that this was a very good plan for the victims and creditors. Because it led to that high level of support, the Sacklers' multi-billion-dollar payment was critical to creating a successful reorganization plan.

That payment was made possible by heavily negotiated settlements among Purdue, the victims and creditors, and the Sacklers. Most relevant here, in exchange for the Sacklers agreeing to pay billions of dollars to the bankruptcy estate, the victims and creditors agreed to release their claims against the Sacklers. The settlement— exchanging releases for the Sacklers' $5.5 to $6 billion payment—enabled the victims and creditors to avoid "the significant risk, cost and delay (potentially years) that

would result from pursuing the Sacklers and related parties through litigation." 1 App. 31.

Indeed, after a 6-day trial involving 41 witnesses, the Bankruptcy Court found that the settlement provided the best chance for the victims and creditors to ever see any money from the Sacklers. See 633 B. R., at 85, 90. (That is a critical point that the Court today whiffs on.) Indeed, the Bankruptcy Court found that the victims and creditors would be unlikely to recover from the Sacklers by suing the Sacklers directly due to numerous potential weaknesses in and defenses to the victims' and creditors' legal theories. See *id.*, at 90–93, 108. Even if the suits were successful, the Bankruptcy Court expressed "significant concern" about the ability to collect any judgments from the Sacklers due to the difficulty of reaching their assets in foreign countries and in spendthrift trusts. *Id.*, at 89; see also *id.*, at 108–109.

For those reasons, the Bankruptcy Court concluded that the $5.5 to $6 billion settlement payment and the releases were fair and equitable and in the victims' and creditors' best interest. *Id.*, at 107–109, 112. The settlement amount of $5.5 to $6 billion was "properly negotiated" and "reflects the underlying strengths and weaknesses of the opposing parties' legal positions and issues of collection." *Id.*, at 93.[3]

From the victims' and creditors' perspective, "suing the Sacklers would have been a costly endeavor with a small chance of success. From the Sacklers' perspective, defending those suits would have been a costly endeavor

_____

[3] The Court implies that some victims could recover from the Sacklers in tort litigation up to the total of their combined assets, and that the Sacklers are somehow getting off easy by paying only $5.5 to $6 billion. But the Court's belief is not rooted in reality given the Bankruptcy Court's undisputed factual findings to the contrary: Large tort recoveries against any of the Sacklers were (and remain) far from certain—and in any event would produce recoveries for only a few and leave other victims with nothing.

with a very small chance of a large liability." A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 1004 (2023). So as in many litigation settlements, the parties agreed to the $5.5 to $6 billion settlement in light of that "very small chance of a large liability." *Ibid.*

Importantly, the victims and creditors—who obviously have no love for the Sacklers—insisted on the releases of their claims against the Sacklers. Tr. of Oral Arg. 61, 93; Brief for Respondent Official Committee of Unsecured Creditors of Purdue Pharma L. P. et al. 10. Why did the releases make sense for the victims and creditors?

For starters, the releases were part of the settlement and enabled the Sacklers' $5.5 to $6 billion settlement payment. Moreover, without the releases, some of Purdue's victims and creditors—maybe a State, maybe some opioid victims— would sue the Sacklers directly for claims "deeply connected with, if not entirely identical to," claims that the victims and creditors held against Purdue. 635 B. R., at 87 (quotation marks omitted). To be sure, the Bankruptcy Court found that those suits would face significant challenges. But the victims and creditors were understandably worried, as they explained during the Bankruptcy Court proceedings, that the Sacklers would "exhaust their collectible assets fighting and/or paying ONLY the claims of certain creditors with the best ability to pursue the Sacklers in court." 1 App. 76. And if even a *single* direct suit against the Sacklers succeeded, the suit could potentially wipe out much if not all of the Sacklers' assets in one fell swoop—making those assets unavailable for the Purdue estate and therefore unavailable for all of the other the victims and creditors.

In sum, if there were no releases, and victims and creditors were therefore free to sue the Sacklers directly, one of three things would likely happen. One possibility is that no lawsuits against the Sacklers would succeed, and

no victim or creditor would recover any money from them. And without the $5.5 to $6 billion settlement payment, there would be no recovery from Purdue either. Another possibility is that a large claim or claims would succeed, and the Sacklers would be indemnified by Purdue—thereby wiping out Purdue's estate for all of the other victims and creditors. Last, suppose that a large claim succeeded and that the Sacklers were not indemnified for that liability. Even in that case, only a few victims or creditors would be able to recover from the Sacklers at the expense of fair and equitable distribution to the rest of the victims and creditors.

As the Second Circuit stated, without the releases, the victims and creditors "would go without any assistance and face an uphill battle of litigation (in which a single claimant might disproportionately recover) without fair distribution." 69 F. 4th, at 80. Another classic collective-action problem.

In short, without the releases and the significant settlement payment, two separate collective-action problems stood in the way of fair and equitable recovery for the victims and creditors: (1) the Purdue estate would not be preserved for the victims and creditors to obtain recovery, and (2) the Purdue estate would be much smaller than it would be with the Sacklers' settlement payment. The releases and settlement payment solved those problems and ensured fair and equitable recovery for the opioid victims.

C

For those reasons, the Bankruptcy Court found that without the releases and settlement payment, the reorganization plan would "unravel." 633 B. R., at 107, 109. All of the "heavily negotiated and intricately woven compromises in the plan" that won the victims' and creditors' approval, *id.*, at 90, would "fall apart for lack of

funding and the inevitable fighting over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection." *Id.*, at 84. There simply would not be enough money to support a reorganization plan that the victims and creditors would approve.

Absent the releases and settlement payment, the Bankruptcy Court found, the "most likely result" would be liquidation of a much smaller $1.8 billion estate. *Id.*, at 90. In a liquidation, the United States would recover first with its $2 billion superpriority claim, taking for itself the whole pie. And the victims and other creditors "would probably recover nothing." *Id.*, at 109.

Given that alternative, it is hardly surprising that the opioid victims and creditors almost universally support Purdue's Chapter 11 reorganization plan and the non-debtor releases. That plan promised to obtain significant assets from the Sacklers, to preserve those assets from being depleted by litigation for a few, and to distribute those much-needed funds fairly and equitably.

As a result, the opioid victims' and creditors' support for the reorganization plan was *overwhelming.* Every victim and creditor had a chance to vote on the plan during the bankruptcy proceedings. And of those who voted, more than 95 percent approved of the plan. *Id.*, at 107.

Since then, even more victims and creditors have gotten on board. Now, all 50 States have signed on to the plan. The lineup before this Court is telling. On one side of the case: the tens of thousands of opioid victims and their families; more than 4,000 state, city, county, tribal, and local government entities; and more than 40,000 hospitals and healthcare organizations. They all urge the Court to uphold the plan.

At this point, on the other side of this case stand only a sole individual and a small group of Canadian creditors.[4]

Given all of the extraordinary circumstances, the Bankruptcy Court and Second Circuit concluded that the non-debtor releases here not only were appropriate, but were essential to the success of the plan. The Bankruptcy Court and Second Circuit thoroughly analyzed each of the relevant factors before reaching that conclusion: First, the released non-debtors (the Sacklers) closely controlled and were indemnified by the company. 69 F. 4th, at 79. Second, the claims against the Sacklers were based on essentially the same facts and legal theories as the claims against Purdue. *Id.*, at 80. Third, the releases were essential for the reorganization to succeed, because the releases protected the Purdue estate from indemnification claims and expanded the Purdue estate to enable victim and creditor recovery. *Id.*, at 80–81. Fourth, the releases were narrowly tailored to protect the estate from indemnification claims. *Ibid.* Fifth, the releases secured a substantial settlement payment to significantly increase the funds in the estate. *Id.*, at 81. Sixth, that enhanced estate allowed the plan to distribute "fair and equitable" payments to the victims and creditors. *Id.*, at 82 (quotation marks omitted). And seventh, for all those reasons, the victims and creditors do not just urgently and overwhelmingly approve of the releases, they all but demanded the releases. *Ibid.*

Congress invited bankruptcy courts to consider exactly those kinds of extraordinary circumstances when it

_____

[4] The regional United States Trustee for three States, a Government bankruptcy watchdog appointed to oversee bankruptcy cases in those States, also opposes the plan for reasons that remain mystifying. The U. S. Trustee purports to look out for victims and creditors, but here the victims and creditors made emphatically clear that the "U. S. Trustee does not speak for the victims of the opioid crisis" and is indeed thwarting the opioid victims' efforts at fair and equitable recovery. Tr. of Oral Arg. 93.

authorized bankruptcy plans to include "any other appropriate provision" that is "not inconsistent" with the Code. §1123(b)(6).

## III

The Court decides today to reject the plan by holding that non-debtor releases are categorically impermissible as a matter of law. That decision contravenes the Bankruptcy Code. It is regrettable for the opioid victims and creditors, and for the heavily negotiated equitable distribution of assets that they overwhelmingly support. And it will harm victims in pending and future mass-tort bankruptcies. The Court's decision deprives the bankruptcy system of a longstanding and critical tool that has been used repeatedly to ensure fair and sizable recovery for victims—to repeat, recovery for *victims*—in mass torts ranging from Dalkon Shield to the Boy Scouts.

On the law, the Court's decision to reject the plan flatly contradicts the Bankruptcy Code. The Code explicitly grants broad discretion and flexibility for bankruptcy courts to handle bankruptcies of extraordinary complexity like this one. For several decades, bankruptcy courts have been employing non-debtor releases to facilitate fair and equitable recovery for victims in mass-tort bankruptcies. In this case, too, the Bankruptcy Court prudently and appropriately employed its discretion to fairly resolve a mass-tort bankruptcy.

At times, the Court seems to view the Sacklers' settlement payment into Purdue's bankruptcy estate as insufficient and the plan as therefore unfair to victims and creditors. If that were true, one might expect the fight in this case to be over whether the non-debtor releases and settlement amount were "appropriate" given the facts and circumstances of this case. 11 U. S. C. §1123(b)(6).

Yet that is not the path the Court takes. The Court does not contest the Bankruptcy Court's and Second Circuit's

conclusion that a non-debtor release was necessary and appropriate for the settlement and the success of Purdue's reorganization—the best, and perhaps the only, chance for victims and creditors to receive fair and equitable compensation. Indeed, no party has challenged the Bankruptcy Court's factual findings or made an argument that non-debtor releases were used inappropriately in this specific case.

Instead, the Court categorically decides that non-debtor releases are *never* allowed as a matter of law. The text of the Bankruptcy Code does not remotely support that categorical prohibition.[5]

As explained, §1123(b)(6)'s catchall authority affords bankruptcy courts broad discretion to approve "any other appropriate provision not inconsistent with the applicable provisions" of the Bankruptcy Code. Recall that §1123(b)(1) expressly authorizes releases of victims' and creditors' claims against the debtor company—here, against Purdue.

––––––––––

[5] To remind the reader of §1123(b)'s lengthy text: A "plan may—

"(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

"(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

"(3) provide for—

"(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

"(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

"(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

"(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

"(6) include any other appropriate provision not inconsistent with the applicable provisions of this title."

And recall that §1123(b)(3) expressly authorizes settlements and releases of the debtor company's claims against non-debtors—here, against the Sacklers. Section 1123(b)(6)'s catchall authority is easily broad enough to allow settlements and releases of the same victims' and creditors' claims against the same non-debtors (the Sacklers), who are indemnified by the debtor and who made a large settlement payment to the debtor's estate. After all, the Second Circuit stated that in indemnification relationships "a suit against the non-debtor is, in essence, a suit against the debtor." *In re Purdue Pharma L. P.*, 69 F. 4th 45, 78 (2023) (quotation marks omitted). And even when the officers and directors are not indemnified, the releases may enable a settlement where the non-debtor makes a sizable payment to the estate that can be fairly and equitably distributed to the victims and creditors, rather than being zeroed out by the first successful suit.

A

So how does the Court reach its atextual and ahistorical conclusion? The Court primarily seizes on the canon of *ejusdem generis*, an interpretive principle that "limits general terms that follow specific ones to matters similar to those specified." *CSX Transp., Inc.* v. *Alabama Dept. of Revenue*, 562 U. S. 277, 294 (2011) (quotation marks and alteration omitted). But the Court's use of that canon here is entirely misguided.

The *ejusdem generis* canon "applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics, as in *dogs, cats, horses, cattle, and other animals*." A. Scalia & B. Garner, Reading Law 199 (2012); see also *id*., at 200–208 ("trays, glasses, dishes, or other tableware"; "gravel, sand, earth or other material"; and numerous other similar lists (quotation marks omitted)); W. Eskridge, Interpreting Law 77 (2016) ("automobiles, motorcycles, and

other mechanisms for conveying persons or things" (quotation marks omitted)).

As a general matter, as Justice Scalia explained for the Court, a catchall at the end of the list should be construed to cover "matters not specifically contemplated—known unknowns." *Republic of Iraq* v. *Beaty*, 556 U. S. 848, 860 (2009). That is the "whole value of a generally phrased residual clause." *Ibid.* Or stated otherwise, the fact that "a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) (quotation marks omitted).

The *ejusdem generis* canon can operate to narrow a broad catchall term in certain circumstances. The canon "parallels common usage," reflecting the assumption that when "the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage." Scalia & Garner, Reading Law, at 199. The canon in essence "implies the addition" of the term "similar" in the catchall so that the catchall does not extend so broadly as to defy common sense. *Ibid.* Rather, the catchall extends to similar things or actions that serve the same statutory "purpose." *Id.*, at 208.

Here, the Court applies the canon to breezily conclude that there is an "obvious link" through §§1123(b)(1)–(5) that precludes a non-debtor release provision being approved under §1123(b)(6). *Ante,* at 11. The obvious link, according to the Court, is that plan provisions must "concern *the debtor*—its rights and responsibilities, and its relationship with its creditors." *Ibid.*

As an initial matter, the Court does not explain why its supposed common thread excludes the non-debtor releases at issue here. Those releases obviously "concern" the debtor in multiple overlapping respects. *Ibid.* As explained,

Purdue's bankruptcy plan released the Sacklers only for claims based on *the debtor's* (Purdue's) misconduct.  See 69 F. 4th, at 80 (releasing only claims to which Purdue's conduct was "a legal cause or a legally relevant factor to the cause of action" (quotation marks omitted)).  The releases therefore applied only to claims held by *the debtor's* victims and creditors.  And the releases protected *the debtor* from indemnification claims.  So the non-debtor releases here did not just "concern" the debtor, they were critical to the debtor's reorganization.

So the Court's purported "link" manages the rare feat of being so vague ("concerns the debtor"?) as to be almost meaningless—and if not meaningless, so broad as to plainly cover non-debtor releases.  It is hard to conjure up a weaker *ejusdem generis* argument than the one put forth by the Court today.

In any event, even on its own terms, the Court's *ejusdem generis* argument is dead wrong for two independent reasons.  First, the Court's purported common thread is factually incorrect as a description of (b)(1) to (b)(5).  Second, and independent of the first point, black-letter law says that the *ejusdem generis* canon requires looking at the "evident purpose" of the statute in order to discern a common thread.  Scalia & Garner, Reading Law, at 208; see Eskridge, Interpreting Law, at 78.  And here, the Court's purported common thread ignores (and indeed guts) the evident purpose of §1123(b).

*First,* the Court's purported common thread is factually incorrect.  The Court says that the "obvious link" through paragraphs (b)(1) to (b)(5) is that all are limited to "*the debtor*—its rights and responsibilities, and its relationship with its creditors." *Ante,* at 11.  But in multiple respects, that assertion is not accurate.

For one thing, paragraph (b)(3) allows a bankruptcy court to modify the rights of debtors with respect to *non-debtors*.  Under (b)(3), a bankruptcy court may approve a

reorganization plan that settles, adjusts, or enforces "any claim" that the debtor holds against non-debtor third parties. That provision allows the debtor's estate to enter into a settlement agreement with a third party, where the estate agrees to release its claims against the third party in exchange for a settlement payment to the bankruptcy estate. And the bankruptcy court has the power to approve such a settlement if it finds the settlement fair and in the best interests of the estate. The bankruptcy court may later enforce that settlement. See generally 7 Collier on Bankruptcy ¶1123.02[3] (R. Levin & H. Sommer eds., 16th ed. 2023).

Importantly, in some cases, including this one, the debtor's creditors may hold derivative claims against that same non-debtor third party for the same "harm done to the estate." 69 F. 4th, at 70 (quotation marks omitted). So when the debtor settles with the non-debtor third party, that settlement also extinguishes the creditors' derivative claims against the non-debtor. And the creditors' consent is not necessary to do so.

To connect the dots: A plan provision settling the debtor's claims against non-debtors under (b)(3) therefore *nonconsensually extinguishes creditors' derivative claims against those non-debtors*. That fact alone defeats the Court's conclusion that §§1123(b)(1)–(5) deal only with relations between the debtor and creditors. If a plan provision under (b)(3) can nonconsensually release some of the creditors' derivative claims against a non-debtor, a plan provision under the catchall in (b)(6) that nonconsensually releases some of the creditors' direct claims against those same non-debtors is easily of a piece—basically the same thing.

This case illustrates the point. Some of the more substantial assets of Purdue's estate are fraudulent transfer claims worth $11 billion that Purdue holds against the non-debtor Sacklers. *In re Purdue Pharma L. P.*, 633

B. R. 53, 87 (Bkrtcy. Ct. SDNY 2021). Under (b)(3), as part of its reorganization plan, Purdue settled the fraudulent transfer claims with the non-debtor Sacklers. The Bankruptcy Court approved that settlement as fair and equitable. *Id.*, at 83–95. That settlement resolved the claims that likely would have had "the best chance of material success among all of the claims against" the Sacklers. *Id.*, at 109; see also *id.*, at 83.

Notably, the result of that settlement was to also *nonconsensually* extinguish the victims' and creditors' derivative fraudulent transfer claims against the Sacklers. In the absence of the bankruptcy proceeding, victims and creditors could have litigated the fraudulent transfer claims themselves as derivative claims. But because Purdue settled the claims under §1123(b)(3), the victims and creditors could no longer do so.

Moreover, not all victims and creditors consented to the release of those derivative claims. But no one disputes that the Bankruptcy Code authorized that nonconsensual non-debtor release of derivative claims. See 69 F. 4th, at 70 (that conclusion is "well-settled").

The plan therefore released both the estate's claims against the Sacklers *and* highly valuable derivative claims that the victims and creditors held against the Sacklers. Paragraph (b)(3) therefore demonstrates that §1123(b) reaches beyond just creditor-debtor relationships, particularly when the relationship between creditors and other non-debtors can affect the estate. That indisputable point alone defeats the Court's conclusion that §1123(b)'s provisions relate only to the debtor and do not allow releases of claims that victims and creditors hold against non-debtors.

The Court tries to sidestep that conclusion by distinguishing derivative claims from direct claims. Releases of derivative claims, the Court says, are authorized by paragraph (b)(3) "because those claims

belong to the debtor's estate." *Ante,* at 12. No doubt. But the question then becomes whether releases of direct claims under (b)(6)'s catchall are relevantly similar to releases of derivative claims that all agree are authorized under (b)(3). The answer in this case is yes. Here, both the derivative and direct claims against the Sacklers are held by the same victims and creditors, and both the derivative and direct claims against the Sacklers could deplete Purdue's estate.

The Court's purported common thread is further contradicted by several other kinds of non-debtor releases that "are commonplace, important to the bankruptcy system, and broadly accepted by the courts and practitioners as necessary and proper" plan provisions under §1123(b)(6). Brief for American College of Bankruptcy as *Amicus Curiae* 3.

Three examples illustrate the point: consensual non-debtor releases, full-satisfaction non-debtor releases, and exculpation clauses.

Consensual non-debtor releases are routinely included in bankruptcy plans even though those releases apply to claims by victims or creditors against non-debtors—just like the claims here. And it is "well-settled that a bankruptcy court may approve" such consensual releases. 69 F. 4th, at 70; see also Brief for American College of Bankruptcy as *Amicus Curiae* 5–7.

Consensual releases are uncontroversial, but they are not expressly authorized by the Bankruptcy Code. So the only provision that could possibly supply authority to include those releases in the bankruptcy plan is the catchall in §1123(b)(6).

The Court today does not deny that consensual releases are routine in the bankruptcy context and that courts have long approved them. See *ante*, at 18–19. But where, on the Court's reading of the Bankruptcy Code, would the bankruptcy court obtain the authority to enter and later enforce that consensual release?

One suggestion is that the authority comes from the parties' consent and is akin to a "contractual agreement." Tr. of Oral Arg. 33. But that theory does not explain what provision of the Bankruptcy Code authorizes consensual releases *in bankruptcy plans*. After all, contracts are enforceable under state law, ordinarily in state courts. But in bankruptcy, consensual releases are routinely part of a reorganization plan with voting overseen by the bankruptcy court and conditions enforceable by the bankruptcy court. See Brief for American College of Bankruptcy as *Amicus Curiae* 4–7.

To reiterate, the only provision that could provide such authority is §1123(b)(6). So if the Court thinks that a consensual release can be part of the plan, even the Court must acknowledge that §1123(b)(6) can reach creditors' claims against non-debtors.

The Court's purported common thread is still further contradicted by yet another regular bankruptcy practice: full-satisfaction releases. Full-satisfaction releases provide full payment for creditors' claims against non-debtors and then release those claims. When a full-satisfaction release is included in a reorganization plan, the bankruptcy court exercises control over creditors' claims against non-debtors.

Again, the only provision that could possibly supply authority to include those full-satisfaction releases in a bankruptcy plan is the catchall in §1123(b)(6). Any contract-law theory would not work for full-satisfaction releases, given that holdout creditors often refuse to consent to full-satisfaction releases. See, *e.g.*, *In re A. H. Robins Co.*, 880 F. 2d 694, 696, 700, 702 (CA4 1989); *In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B. R. 87, 115–116, 141 (Del. 2023). So if full-satisfaction releases are to be allowed, §1123(b)(6) must be read to reach creditor claims against non-debtors, even without consent.

The Court does not deny that consensual non-debtor releases and full-satisfaction releases might be permissible

under §1123(b)(6). *Ante*, at 19. If they are permissible, then the Court's purported *ejusdem generis* common thread is thoroughly eviscerated because those releases involve claims by victims or creditors against non-debtors, just like here. (And if the Court instead means to hold open the possibility that consensual and full-satisfaction releases are actually impermissible, then its holding today is even more extreme than it appears.)

Exculpation clauses are yet another example. Exculpation clauses shield the estate's fiduciaries and other professionals (non-debtors) from liability for their work on the reorganization plan. See Brief for American College of Bankruptcy as *Amicus Curiae* 9. Without such exculpation clauses, "competent professionals would be deterred from engaging in the bankruptcy process, which would undermine the main purpose of chapter 11—achieving a successful restructuring." *Id.*, at 11; see also Brief for Highland Capital Management, L. P. as *Amicus Curiae* 3–5. For that reason, bankruptcy courts routinely approve exculpation clauses under §1123(b)(6). For exculpation clauses to be allowed, however, §1123(b)(6) must be read to reach creditor claims against non-debtors. So exculpation clauses further refute the Court's purported common thread.

The fact that plan provisions under §1123(b)(6) can reach non-debtors finds still more support in this Court's only case to analyze the catchall authority in §1123(b)(6), *United States* v. *Energy Resources Co.* The plan provision in *Energy Resources* ordered the IRS, a creditor, to apply the debtor's tax payments to trust-fund tax liability before other kinds of tax liability. *United States* v. *Energy Resources Co.*, 495 U. S. 545, 547 (1990). Importantly, if the debtor did not pay the trust-fund tax liability, then non-debtor officers of the company would be on the hook. *Ibid.* So the plan provision served to protect the company's non-debtor officers from "personal liability" for those taxes.

*In re Energy Resources Co.*, 59 B. R. 702, 704 (Bkrtcy. Ct. Mass. 1986). In exchange for that protection, a non-debtor officer contributed funds to the bankruptcy plan. *Ibid.*

Echoing the Court today, the IRS objected to that plan, arguing that the bankruptcy court exceeded its authority under (b)(6) in part because there was no provision in the Code that expressly supported the plan provision. *Energy Resources*, 495 U. S., at 549–550. But this Court disagreed with the IRS and approved the plan based on the "residual authority" in (b)(6). *Id.*, at 549.

The plan provision in *Energy Resources* operated akin to a non-debtor release: It reduced the potential liability of a non-debtor (the non-debtor's officers) to another non-debtor (the IRS). *Energy Resources* therefore further demonstrates that plan provisions under §1123(b)(6) can affect creditor–non-debtor relationships.

In sum, the Court's statement that §1123(b) reaches only "*the debtor*—its rights and responsibilities, and its relationship with its creditors," *ante,* at 11, is factually incorrect several times over. Paragraphs 1123(b)(3) and (b)(6) already allow plans to affect creditor claims against non-debtors, such as through releases of creditors' derivative claims, consensual releases, full-satisfaction releases, and exculpation clauses. And this Court's precedent in *Energy Resources* confirms the point. The Court's *ejusdem generis* argument rests on quicksand.

*Second*, independent of those many flaws, the Court's entire approach to *ejusdem generis* is wrong from the get-go. When courts face a statute with a catchall, it is black-letter law that courts must try to discern the common thread by examining the "evident purpose" of the statute. Scalia & Garner, Reading Law, at 208; see also *Begay* v. *United States*, 553 U. S. 137, 146 (2008) (defining common thread "in terms of the Act's basic purposes"); Eskridge,

Interpreting Law, at 78 ("statutory purpose" helps identify the common thread in *ejusdem generis* cases).[6]

Importantly, this Court has already explained that the purpose of §1123(b) is to grant bankruptcy courts "broad power" to approve plan provisions "necessary for a reorganization's success." *Energy Resources*, 495 U. S., at 551. *Energy Resources* demonstrates that the common thread of §1123(b) is bankruptcy court action to preserve the estate and ensure fair and equitable recovery for creditors. See, *e.g.*, *Pioneer Investment Services Co.* v. *Brunswick Associates L. P.*, 507 U. S. 380, 389 (1993); *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 528 (1984); J. Feeney & M. Stepan, 2 Bankruptcy Law Manual §11:1 (5th ed. 2023).

As explained at length above, to maximize recovery, the Court must solve complex collective-action problems. And for a bankruptcy court to solve all of the relevant collective-action problems, §§1123(b)(1)–(5) give the bankruptcy court broad power to modify parties' rights without their consent—most notably, to release creditors' claims against the debtor. §1123(b)(1). Under that provision, the Purdue plan released the victims' and creditors' claims *against Purdue* in order to prevent a collective-action problem in distributing Purdue's assets—and thereby to preserve the estate and ensure fair and equitable recovery for victims and creditors.

---

[6] The Court protests that we are looking to the "purpose" of the statute. But in *ejusdem generis* cases, courts are *required* to look at "purpose" in order to determine the common link, as Scalia and Garner and Eskridge all say, and as *Begay* indicated. That is longstanding black-letter law. And even outside the *ejusdem generis* context, the Court's allergy to the word "purpose" is strange. After all, "words are given meaning by their context, and context includes the purpose of the text. The difference between textualist interpretation" and "purposive interpretation is not that the former never considers purpose. It almost always does," but "the purpose must be derived from the text." A. Scalia & B. Garner, Reading Law 56 (2012).

The non-debtor release provision approved under §1123(b)(6) does the same thing and serves that same statutory purpose. As discussed above, the victims' and creditors' claims against the non-debtor Purdue officers and directors (the Sacklers) are essentially the same as their claims against Purdue. The claims against the Sacklers rest on the same legal theories and facts as the claims against Purdue, largely the Sacklers' opioid-related decisions in running Purdue. And the Sacklers are indemnified by Purdue's estate for their liability. So any liability could potentially come out of the Purdue estate just like the claims against Purdue itself.

Therefore, the nonconsensual releases against the Sacklers are not only of a similar genus, but in effect *the same thing* as the nonconsensual releases against Purdue that everyone agrees §1123(b)(1) already authorizes. Both were necessary to preserve the estate and prevent collective-action problems that could drain Purdue's estate, and thus both were necessary to enable Purdue's reorganization plan to succeed and to equitably distribute assets. And without the releases, there would be no settlement, meaning no $5.5 to $6 billion payment by the Sacklers to Purdue's estate. That would mean either that no victim or creditor could recover anything from the Sacklers (or indeed from Purdue), or that only a few victims or creditors could recover from the Sacklers at the expense of fair and equitable distribution to everyone else.

The statute's evident purpose therefore easily answers the *ejusdem generis* inquiry here. Absent other limitations and restrictions in the Code, §1123(b)(6) authorizes a bankruptcy court to modify parties' claims that could otherwise threaten to deplete the bankruptcy estate when doing so is necessary to preserve the estate and provide fair and equitable recovery for creditors.

In light of the "evident purpose" of §1123(b) to preserve the estate and ensure fair and equitable recovery for

creditors in the face of collective-action problems, Scalia & Garner, Reading Law, at 208; see Eskridge, Interpreting Law, at 78, the Court's *ejusdem generis* theory simply falls apart.

In sum, for each of two independent reasons, the Court's *ejusdem generis* argument fails. First, its common thread is factually wrong. And second, its purported common thread disregards the evident purpose of §1123(b).

B

Despite the fact that non-debtor releases address the very collective-action problem that the bankruptcy system was designed to solve, the Court next trots out a few minimally explained arguments that non-debtor release provisions are "inconsistent with" various provisions of the Bankruptcy Code, including: (i) §524(g)'s authorization of non-debtor releases in asbestos cases; (ii) §524(e)'s statement that debtors' discharges do not automatically affect others' liabilities; and (iii) the Code's various restrictions on bankruptcy discharges. None of those arguments is persuasive.

*First*, the Court cites §524(g), which was enacted in 1994 to expressly authorize non-debtor releases in a specific context: cases involving mass harm "caused by the presence of, or exposure to, asbestos or asbestos-containing products." §524(g)(2)(B)(i)(I). From the fact that §524(g) allows non-debtor releases in the asbestos context, the Court infers that non-debtor releases are prohibited in other contexts. *Ante,* at 15.

But the very text of §524(g) *expressly precludes* the Court's inference. The statute says: "Nothing in [§524(g)] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." 108 Stat. 4117, note following 11 U. S. C. §524. Congress expressly authorized non-debtor releases in one specific

context that was critically urgent in 1994 when it was enacted. But Congress also enacted the corresponding rule of construction into binding statutory text to "make clear" that §524(g) did not "alter" the bankruptcy courts' ability to use non-debtor release mechanisms as appropriate in other cases. 140 Cong. Rec. 27692 (1994).

Keep in mind that Congress enacted §524(g) in the early days of non-debtor releases, soon after bankruptcy courts began approving non-debtor releases in asbestos cases. See, *e.g.*, *In re Johns-Manville Corp.*, 68 B. R. 618, 621–622 (Bkrtcy. Ct. SDNY 1986), aff'd, 837 F. 2d 89, 90 (CA2 1988); *UNARCO Bloomington Factory Workers* v. *UNR Industries, Inc.*, 124 B. R. 268, 272, 278–279 (ND Ill. 1990). Section 524(g) set forth a detailed scheme sensitive to the specific needs of asbestos mass-tort litigation that was then engulfing and overwhelming American courts. For example, because asbestos injuries often have a long latency period, asbestos mass-tort bankruptcies needed to account for unknown claimants who could come out of the woodwork in the future. See Bankruptcy Reform Act of 1994, 108 Stat. 4114–4116; *In re Johns-Manville Corp.*, 68 B. R., at 627–629.

But as explained above, throughout the history of the Code and at the time §524(g) was enacted, bankruptcy courts were also issuing non-debtor releases in other contexts as well, such as in the Dalkon Shield mass-tort bankruptcy case. *A. H. Robins Co.*, 880 F. 2d, at 700–702; see also, *e.g.*, *In re Drexel Burnham Lambert Group, Inc.*, 960 F. 2d 285, 293 (CA2 1992) (securities litigation context). Congress therefore made clear that enacting §524(g) for the urgent asbestos cases did not disturb bankruptcy courts' preexisting authority to issue such releases in other cases.

Bottom line: The Court's reliance on §524(g) directly contravenes the actual statutory text.

*Second*, the Court cites §524(e), which states that a plan's discharge of the debtor "does not affect the liability of any

other entity on . . . such debt." By its terms, §524(e) does not purport to preclude releases of creditors' claims against non-debtors. (And were the rule otherwise, even consensual releases would be prohibited as well.)

Notably, Congress changed §524(e) to its current wording in 1979. Before 1979, the statute arguably did preclude releases of claims against non-debtors who were co-debtors with a bankrupt company. See 11 U. S. C. §34 (1976 ed.) (repealed Oct. 1, 1979) ("The liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt *shall not* be altered by the discharge of such bankrupt" (emphasis added)). But Congress then changed the law. And the text now means only that the discharge of the debtor does not *itself* automatically wipe away the liability of a non-debtor. Section 524(e) does not speak to the issue of non-debtor releases or other steps that a plan may take regarding the liability of a non-debtor for the same debt. As the American College of Bankruptcy says, "Section 524(e) is agnostic as to third-party releases." Brief for American College of Bankruptcy as *Amicus Curiae* 6, n. 3; see also *In re Airadigm Communications, Inc.*, 519 F. 3d 640, 656 (CA7 2008).

*Third*, citing §§523(a), 524(a), and 541(a), the Court says that the plan improperly grants a "discharge" to the Sacklers. *Ante,* at 4, 14–15. And the Court suggests that giving the Sacklers a "discharge" in Purdue's bankruptcy plan in exchange for $5.5 to $6 billion allows the Sacklers to get away too easy—without filing for bankruptcy themselves, without having to comply with the Code's various restrictions, and without paying enough. See *ante,* at 14–15. That point also fails.

To begin, the premise is incorrect. The Sacklers did not receive a bankruptcy discharge in this case. Discharge is a term of art in the Bankruptcy Code. *Wainer* v. *A. J. Equities, Ltd.*, 984 F. 2d 679, 684 (CA5 1993); J. Silverstein, Hiding in Plain View: A Neglected Supreme Court Decision

Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations, 23 Emory Bkrtcy. Developments J. 13, 130 (2006). When a debtor in bankruptcy receives a discharge, most (if not all) of their pre-petition debts are released, giving the debtor a fresh start. See §1141(d)(1) (Chapter 11 discharge relieves the debtor "from any debt that arose before the date of" plan confirmation, with narrow exceptions); *Taggart* v. *Lorenzen*, 587 U. S. 554, 556, 558 (2019). The Sacklers did not receive such a discharge.

As courts have always recognized, non-debtor releases are different. Non-debtor releases "do not offer the umbrella protection of a discharge in bankruptcy." *Johns-Manville Corp.*, 837 F. 2d, at 91. Rather, non-debtor releases are accompanied by settlement payments to the estate by the non-debtor. So non-debtor releases are simply one part of a settlement of pending or potential claims against the non-debtor that arise out of some torts committed by the debtor. They are in essence a traditional litigation settlement. They are not a blanket discharge for the non-debtor.

Here, therefore, the releases apply only to certain claims against the Sacklers—namely, those "that arise out of or relate to" Purdue's bankruptcy. *Ibid.*; see 69 F. 4th, at 80 (releasing the Sacklers only for claims to which Purdue's conduct was "a legal cause or a legally relevant factor to the cause of action" (quotation marks omitted)). And the non-debtor releases were negotiated in exchange for a significant settlement payment that enabled *Purdue's* bankruptcy reorganization to succeed.

In short, the releases do not grant discharges to non-debtors and cannot be disallowed on that basis.

Next, the Court suggests that the Sacklers must file for bankruptcy themselves in order to be released from liability. That, too, is incorrect. Nowhere does the Code say that a non-debtor may be released from liability only by

filing for bankruptcy.  On the contrary, §1123(b)(3) of the Code already expressly allows a bankruptcy plan to release a non-debtor from liability to the debtor.

The Court's suggestion that a non-debtor must file for bankruptcy in order to be released from liability not only is directly at odds with the text of the Code, but also is at odds with reality.  Non-debtor releases are often used in situations where it is not possible or practicable for the non-debtors to simply file for individual bankruptcies.  This case is just one example.  The "Sacklers are not a simple group of a few defendants" that could simply have declared one bankruptcy.  633 B. R., at 88.  They are "a large family divided into two sides, Side A and Side B, with eight pods or groups of family members within those divisions," many of whom live abroad (beyond bankruptcy jurisdiction).  *Ibid*. And their assets are spread across trusts that are likely beyond the jurisdiction of U. S. courts as well.  *Ibid.*; see also *id.*, at 109.

Likewise, in many other mass-tort bankruptcy cases, released non-parties could not simply declare their own bankruptcies either.  Insurers, for example, cannot declare bankruptcy just because a policy limit is reached. B. Zaretsky, Insurance Proceeds in Bankruptcy, 55 Brooklyn L. Rev. 373, 394–395, and n. 60 (1989).  And in cases involving hundreds of affiliated entities who share liability and share insurance, such as the Boy Scouts and the Catholic Church, it would be almost impossible to coordinate assets and ensure equitable victim recovery across hundreds of distinct bankruptcies.  Section §1123(b)(6) provides bankruptcy courts with flexibility to deal with such situations by approving appropriate non-debtor releases.  See Brief for Boy Scouts of America as *Amicus Curiae* 18–20; Brief for Ad Hoc Group of Local Councils of the Boy Scouts of America as *Amicus Curiae* 6; Brief for U. S. Conference of Catholic Bishops as *Amicus Curiae* 3–4, 17–22.

The Court next says that the non-debtor release allowed the Sacklers to bypass certain restrictions on discharges— for example, that individual debtors are generally not discharged for fraud claims, §523(a). That argument fails for the same reason. Non-debtor releases are part of a negotiated settlement of potential tort claims. They are not a discharge. And nothing in §523(a) prohibits a debtor's reorganization plan from *releasing* non-debtors for fraud claims. Indeed, it is undisputed that Purdue's bankruptcy could release the Sacklers from at least some fraud claims—namely, the fraudulent transfer claims—under §1123(b)(3). No provision in the Code forbids releasing other fraud claims against the Sacklers, too. The Court's concern that the releases apply to claims for "fraud," *ante,* at 15, therefore falls flat.

In all of those scattershot arguments, the Court seems concerned that the Sacklers' $5.5 to $6 billion settlement payment was not enough. To begin with, even if that were true, it would not be a reason to *categorically* disallow non-debtor releases as a matter of law, as the Court does today. In any event, that concern is unsupported by the record and contradicted by the Bankruptcy Court's undisputed findings of fact. The Bankruptcy Court found that the creditors' and victims' ability to recover directly from any of the Sacklers in tort litigation was far from certain. So as in other tort settlements, the settlement amount here reflected the parties' assessments of their probabilities of success and the likely amount of possible recovery. The Court today has no good basis for its subtle second-guessing of the settlement amount.

And lest we miss the forest for the trees, keep in mind that the victims and creditors have no incentive to short their own recoveries or to let the Sacklers off easy. They despise the Sacklers. Yet they strongly support the plan. They call the settlement a "remarkable achievement." Brief for Respondent Ad Hoc Group of Individual Victims of

Purdue Pharma, L. P. et al. 2.  And given the high level of victim and creditor support, the Bankruptcy Court emphasized: "[T]his is *not* the Sacklers' plan," and "anyone who contends to the contrary" is "simply misleading the public."  633 B. R., at 82.

The Court today unfortunately falls into that trap.  And it is rather paternalistic for the Court to tell the victims that they should have done better—and then to turn around and leave them with potentially nothing.

C

Finally, the Court suggests that non-debtor releases are not "appropriate" because they are inconsistent with history and practice.  That, too, is seriously mistaken.

Importantly, Congress did not enact the current Bankruptcy Code—and with it, §1123(b)(6)—until 1978. Bankruptcy Code of 1978, 92 Stat. 2549.  For nearly the entire life of the Code, courts have approved non-debtor release provisions like this one.  So for decades, Chapter 11 of the Code has been understood to grant authority for such releases when appropriate and necessary to the success of the reorganization.[7]

The Court's citations to pre-Bankruptcy Code cases are an off-point deflection and do not account for important and relevant changes made in the current Bankruptcy Code.

───────────
[7] See, *e.g.*, *In re Johns-Manville Corp.*, 68 B. R. 618, 624–626 (Bkrtcy. Ct. SDNY 1986), aff'd, 837 F. 2d 89, 90, 93–94 (CA2 1988); *In re A. H. Robins Co.*, 88 B. R. 742, 751 (ED Va. 1988), aff'd, 880 F. 2d 694, 700– 702 (CA4 1989); *UNARCO Bloomington Factory Workers* v. *UNR Industries, Inc.*, 124 B. R. 268, 272, 278–279 (ND Ill. 1990); *In re Drexel Burnham Lambert Group, Inc.*, 960 F. 2d 285, 293 (CA2 1992); *In re Master Mortgage Inv. Fund, Inc.*, 168 B. R. 930, 938 (Bkrtcy. Ct. WD Mo. 1994); *In re Dow Corning Corp.*, 280 F. 3d 648, 653 (CA6); *In re Airadigm Communications, Inc.*, 519 F. 3d 640, 655–658 (CA7 2008); *In re Seaside Engineering & Surveying, Inc.*, 780 F. 3d 1070, 1081 (CA11 2015); *In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B. R. 87, 112, 135–143 (Del. 2023).  I could add dozens more citations to this footnote.  But the point is clear.

For example, unlike the former Bankruptcy Act of 1898, the modern Bankruptcy Code grants courts jurisdiction over "suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp.* v. *Edwards*, 514 U. S. 300, 307, n. 5 (1995); see 28 U. S. C. §§157(a), 1334(b) (giving bankruptcy courts jurisdiction over any litigation "related to" the bankruptcy).

Under the current Bankruptcy Code, it is well settled that Chapter 11 bankruptcies can and do affect relationships between creditors and non-debtors who are intimately related to the bankruptcy. For example, under the modern Bankruptcy Code, bankruptcy courts routinely use their broad jurisdiction and equitable powers to stay any litigation—even litigation entirely between third parties—that would affect the bankruptcy estate. *Celotex*, 514 U. S., at 308–310.

The longstanding practice of staying litigation that could affect the bankruptcy estate is similar in important respects to non-debtor releases. In each situation, a provision of the Code provides an explicit authority: to stay litigation involving the debtor, §362, and to release claims involving the debtor, §§1123(b)(1), (3). And in each, the bankruptcy court invokes its broad jurisdiction and equitable power to "augment" that authority, extending it to litigation and claims against non-debtors that might have a "direct and substantial adverse effect" on the bankruptcy estate. *Celotex*, 514 U. S., at 303, 310.

In short, the common and long-accepted practice of staying litigation that could affect the bankruptcy estate shows that under the modern Code, bankruptcy courts can and do exercise control over relationships between creditors

and non-debtors.  The Court's reliance on pre-Code practice is misplaced.[8]

## IV

As I see it, today's decision makes little sense legally, practically, or economically.   It upends the carefully negotiated Purdue bankruptcy plan and the prompt and substantial recovery guaranteed to opioid victims and creditors.  Now the opioid victims and creditors are left holding the bag, with no clear path forward.  To reiterate the words of the victims: "Without the release, the plan will unravel," and "there will be no viable path to any victim recovery."  Tr. of Oral Arg. 100.

The Court does not say what should happen next.  The Court seems to hope that a new deal is possible, with the Sacklers buying off the last holdouts.

But even if it were true that the parties could eventually reach a new deal, that outcome would likely come at a cost. Future negotiations and litigation would mean additional litigation expense that eats away at the recovery that the opioid victims and creditors have already negotiated, as well as years of additional delay even though victims and family members want and need relief *now*.

And more to the point, without non-debtor releases, a new deal will be very difficult to achieve.  By eliminating nonconsensual non-debtor releases, today's decision gives every victim and every creditor an absolute right to sue the Sacklers.  Some may hold out from any potential future settlement and instead sue because they want to have their day in court to hold the defendants accountable, or because they want to try to hit the jackpot of a large recovery that they can keep all to themselves.  Moreover, because every

---

[8]The Court insists that pre-Code practice "may inform our work." *Ante*, at 17, n. 6.  But pre-Code practice certainly does not play a role when that practice has been superseded by an express provision of the modern Bankruptcy Code.

victim and creditor knows that the Sacklers' resources are limited, they will now have an incentive to promptly sue the Sacklers before others sue. To be sure, the victims and creditors would face an uphill climb in any such litigation, the Bankruptcy Court found, so it may be that no one will succeed in tort litigation against the Sacklers, meaning that no one will get anything. But even if just one of the victims or creditors—say, a State or a group of victims—is successful in a suit against the Sacklers, its judgment "could wipe out all of the collectible Sackler assets," which in turn could also deplete Purdue's estate and leave nothing for any other victim or creditor. *Id*., at 103. That reality means that everyone has an incentive to race to the courthouse to sue the Sacklers pronto—the classic collective-action problem.

Because some victims or creditors may hold out from any potential future settlement for any one of those reasons and instead still sue, the Sacklers are less likely to settle with anyone in the first place. Maybe the clouds will part. But in a world where nonconsensual non-debtor releases are categorically impermissible, any hope for a new deal seems questionable—indeed, the parties to the bankruptcy label it "pure fantasy." Brief for Debtor Respondents 4.

The bankruptcy system was designed to prevent that exact sort of collective-action problem. Non-debtor releases have been indispensable to solving that problem and ensuring fair and equitable *victim recovery* in multiple bankruptcy proceedings of extraordinary scale—not only opioids, but also many other mass-tort cases involving asbestos, the Boy Scouts, the Catholic Church, silicone breast implants, the Dalkon Shield, and others.

The Court's apparent concern that the Sacklers' settlement payment of $5.5 to $6 billion was not enough should have led at most to a remand on whether the releases were "appropriate" under 11 U. S. C. §1123(b)(6) (if anyone had raised that argument here, which they have

not). But instead the Court responds with the dramatic step of repudiating the plan and eliminating non-debtor releases altogether.

The Court's decision today jettisons a carefully circumscribed and critically important tool that bankruptcy courts have long used and continue to need to handle mass-tort bankruptcies going forward. The text of the Bankruptcy Code does not come close to requiring such a ruinous result. Nor does its structure, context, or history. Nor does hostility to the Sacklers—no matter how deep: "Nothing is more antithetical to the purpose of bankruptcy than destroying estate value to punish someone." A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 1017 (2023). Gutting this longstanding bankruptcy court practice is entirely counterproductive, and simply inflicts still more injury on the opioid victims.

Opioid victims and other future victims of mass torts will suffer greatly in the wake of today's unfortunate and destabilizing decision. Only Congress can fix the chaos that will now ensue. The Court's decision will lead to too much harm for too many people for Congress to sit by idly without at least carefully studying the issue. I respectfully dissent.